STATE of Delaware ex rel. ARMOUR
AND COMPANY

v.

GULF SULPHUR CORPORATION and Lith-
ium Corporation of America, Inc.

Superior Court of Delaware.

New Castle.

April 25, 1967.

Richard F. Corroon, Wilmington, for Armour and Co.

Andrew B. Kirkpatrick, Jr., Wilmington, for Gulf Sulphur Corp.

Arthur J. Sullivan, Wilmington, for Lithium Corp. of America, Inc.

QUILLEN, Judge.

Armour and Company (Armour), as a shareholder, has petitioned the Court for a writ of mandamus requiring Gulf Sulphur Corporation (Gulf) to make available to Armour certain books and records of Gulf. In particular, Armour, by letter dated February 16, 1967, demanded permission to examine and copy the following:

"1. The original or duplicate stock ledger of the Company;

"2. The minutes of the Board of Directors of the Company and all of its subsidiaries and the minutes, if any, of Executive Committees of such boards since January 1, 1963 to date of examination;

"3. All books of account of the Company and its subsidiaries from January 1, 1965 to date of examination;

"4. All written or printed matter prepared for or in the possession of the Company or any of its subsidiaries dealing with the mineral reserves of the Company or any of its subsidiaries from January 1, 1960 to date of examination; and

"5. All written or printed matter exchanged between any officer, employee, agent or attorney of the Company or any of its subsidiaries and any officer, employee, agent or attorney of Lithium Corp. of America, Inc., a Minnesota corporation (Lithium), or any of its subsidiaries pertaining in any way to any contemplated transaction between the Company and Lithium including, without limiting the generality of the foregoing, any and all estimates, reports or representations pertaining to the assets of Lithium or any of its subsidiaries and their believed worth or potential worth."

Lithium Corporation of America, Inc. (Lithium) intervened and a three day hearing was held. This letter constitutes the Court's opinion and order in the case.

Preliminarily, certain procedural matters should be clarified for the record in regard to the depositions. The document submitted by Gulf headed "Deposition Pages To Be Put in Evidence By Defendant" should be marked for identification as "Defendant's For Identification I". The

three Prince depositions should be marked as follows:

Deposition of March 6, 1967 (Anti-Trust case):
Defendant's Exhibit 9

Deposition of April 7, 1967:
Defendant's Exhibit 10

Deposition of April 14, 1967:
Defendant's Exhibit 11

The two Horner depositions should be marked as follows:

Deposition of March 7, 1967, (Anti-Trust case):
Defendant's Exhibit 12

Deposition of April 14, 1967:
Defendant's Exhibit 13

The two McAdams depositions should be marked as follows:

Deposition of March 6, 1967 (Anti-Trust case):
Defendant's Exhibit 14

Deposition of April 7, 1967:
Defendant's Exhibit 15.

The Orem deposition of April 14, 1967, should be marked Defendant's Exhibit 16. The Allen deposition of March 3, 1967 (Anti-Trust case) should be marked Plaintiff's Exhibit 6(a) and (b).

Secondly, Lithium has on record a motion for summary judgment. That motion is denied and the Court will decide the merits of the case based on the testimony as to the facts and not as a matter of law.

Thirdly, as the Court indicated at the argument on April 12, 1967, the Court has had some difficulty with Gulf's second defense and the introduction of the pleadings in the anti-trust case. It does not seem to the Court that it is concerned with the anti-trust litigation here. I am, therefore, striking the second defense which relates to the anti-trust litigation in Texas. I understand that Gulf's position is that Armour wants the information it seeks as a sulphur consumer and not for any corporate purpose of Gulf. I am satisfied that such a position is properly raised by Gulf's first defense, and, even if it were not, I would grant a motion to amend the pleadings to conform with the defense evidence. But, I consider that position part of the first defense so amendment is unnecessary.

Fourthly, Lithium has rested its defense in part on trade secrets. As I indicated at trial, I have grave doubt that Lithium has presented sufficient evidence to adequately introduce the trade secret concept into the case. Indeed, although Lithium suggests some general trade secrecy, only one item, the process for producing potassium sulfate, is even generally pinpointed in the record and there has been only highly inferential evidence to indicate any competitive advantage inherent in that process or even to show its secrecy. In any event, I do not reach that issue and nothing in this opinion is based on trade secret concepts. To put it another way, for the purposes of this decision, it is assumed none of the Lithium information involved trade secrets. I do think, however, that Lithium has adequately introduced the secrecy agreement in the case as a matter of contract law. Thus, Lithium's Exhibit No. 1, the agreement of December 2, 1966, is properly admitted into evidence and may be considered by the Court. As indicated above, however, the mere existence of this contract does not entitle Lithium or, for that matter, Gulf to judgment as a matter of law in this proceeding. The evidence of precautions taken by Lithium to prevent publication of its internal information, including Lithium's Exhibit No. 2, is admissible to explain its contractual defense and does not depend on a judicial finding that trade secrets were involved. Lithium's position is simply that the information should not be disclosed because it was given to Gulf under that express agreement.

Fifthly, as to the stock ledger list, I understand Gulf takes the position

that the list question is moot because the list was made available pursuant to the 10 day statute, 8 Del.C. § 219, on Monday, April 17th. Armour, on the other hand, takes the position that it is entitled to a judicial determination on the list under 8 Del.C. § 220 because the list should have been made available in February. As I understand mandamus actions, they are designed to compel some action by the defendant. Actions in mandamus are not designed merely to declare the rights of the parties. The list has been provided and, insofar as mandamus is concerned, the question of the list is moot. I am sure any dispute which may arise between the parties as to timeliness can be adequately handled by the forum hearing the dispute on the facts presented to it. Thus, this opinion is only directed to categories 2 through 5 as set forth in Armour's letter of demand.

Although the record is lengthy, there is no significant controversy in regard to the pertinent basic facts. I will not dwell on the factual details. I do make the following findings of fact and other facts which may hereafter be referred to in the opinion should be considered as findings of the Court.

1.  Armour needs sulphur in certain of its manufacturing operations.

2.  Armour is a heavy consumer of sulphur and its purchases of raw sulphur run about 250,000 tons per year.

3.  Armour is interested in sources of sulphur independent of its stockholder interest in Gulf.

4.  Armour is itself a potential producer of sulphur and would be interested in developing its own source if it was economically in Armour's best interest to do so.

5.  Gulf produces approximately 350,000 tons of sulphur per year through a Mexican subsidiary. Gulf has been essentially a single mine operation in Mexico.

6.  In the spring of 1966, Armour tried unsuccessfully to buy sulphur from Gulf. At that time, sulphur was scarce and Armour was in desperate need of sulphur. Gulf's operation in Mexico is such that it was well suited to supply Armour logistically.

7.  At the meeting of Armour's Executive Committee on June 9, 1966, it was recommended that Armour (1) buy up to $7,500,000 of Gulf's shares; (2) investigate the production, financial, contract and government status of Gulf; (3) discuss the desirability and feasibility of acquiring additional interest in Gulf with Gulf's officers.

8.  The recommendation to buy up to $7,500,000 of Gulf shares was approved by the Board of Directors on August 4, 1966.

9.  During June and July of 1966, Armour purchased approximately four million dollars worth of Gulf stock, the greater portion of which Armour still holds. Armour's interest in Gulf is approximately ten per cent of the outstanding shares.

10.  On approximately June 8, 1966, a proposed merger of Gulf and Western Industries, Inc., was announced and this fact was known to Armour prior to any purchase of Gulf's shares.

11.  Lithium and Gulf began negotiations leading to an association in late November or early December of 1966. Lithium permitted Gulf to have certain documents and material in accordance with conditions set forth in the secrecy agreement of December 2, 1966. The Gulf-Lithium merger proposal was first announced at the end of January 1967, and Armour first learned of the

proposal through the public announcement.

12. Gulf possesses detailed information and reports relating to the Lithium merger which are not available to Armour and which were necessary for the judgment exercised by Gulf's directors in approving the merger proposal.

13. Lithium is engaged in a joint venture with Chemsalt Corporation at Great Salt Lake. Subject to final tests and financing, it is anticipated that extraction of minerals on a commercial scale will be undertaken. This joint venture is important in determining the value of Lithium stock.

The basic positions of the parties at trial are also simple to summarize.

Armour argues that its purpose is stated in its letter of demand where it said "it desires to examine the minutes and data referred to above in order to determine whether or not the transaction with Lithium would be in the best interests of the Company and its stockholders".

Gulf and Lithium deny Armour's stated purpose. Gulf says Armour is out to control Gulf's sulphur production. Gulf further states Armour has made up its mind to oppose the merger and therefore does not need the information for the purpose alleged. Gulf and Lithium both rely on the secrecy contract.

The petition seeks a writ of mandamus. Partly because of the volume of the record, unusual for this type of proceeding, it is worthwhile to review some fundamental legal concepts to place the record in proper perspective.

It is important to bear in mind the nature of the remedy being requested. In State ex rel. Jones v. Wise, 9 W.W.Harr. 409, 200 A. 418, 421 (Super.Ct.1938), Chief Justice Layton made the following general comments about mandamus:

"In this State, mandamus is a prerogative writ in the supervisory sense, issuable not of course, but only in the exercise of a sound judicial discretion. [Citation] It was a remedial process introduced to prevent disorder from a failure of justice and defect of police. [Citation] Generally, it is agreed that the process is awarded upon equitable principles, [Citation] and, it has been said that every mandamus, in a manner, seeks the aid of equity, and although it is an extraordinary legal remedy, it is in the nature of an equitable interference supplementing the deficiencies of the common law. [Citation.] "The discretion to be exercised by the Court is not an arbitrary or capricious discretion, but a sound, judicial discretion for the prevention of palpable injustice. The Court is not compelled, as of course, to allow the writ merely upon a showing of a clear legal right for which mandamus would be an appropriate remedy; but in the exercise of its discretion the Court may and should consider a wide variety of circumstances in determining whether the writ should issue. Regard should be had for the exigency which calls for the exercise of the discretion, the interests of the public and of third persons, the nature and extent of the wrong or injury which would follow upon a refusal of the writ, and the promotion of substantial justice."

It is also important to review the nature of legal right being asserted and to relate it to the remedy. In the case of State ex rel. Theile v. Cities Service Co., 1 W.W. Harr. 514, 115 A. 773, 775, 776 (Sup.Ct. 1922), Chancellor Wolcott summarized the common law right which is involved here and spoke of the related stock ledger statute as follows:

"At common law the writ of mandamus was available to stockholders of corporations to secure to them the right of inspection of corporate books of all kinds, provided, of course, the petitioning stockholder could bring his case within the

rules that controlled the courts in the exercise of their sound judicial discretion. Upon the stockholder was the burden of showing to the court in the first instance those special circumstances which would justify it in interposing its mandatory process in his behalf. At common law, the right to inspect corporate books was a qualified right, and allowable only when the stockholder was actuated by motives that were lawful and proper and by a purpose to subserve his interests as a holder of the corporate stock. And, accordingly, the petitioner was required to bring his case by adequate averments in his petition, within the limitations of the right above indicated."

"We are of the opinion that the right given to the stockholder by the statute to inspect the company's books is given to him as stockholder and is to be exercised by him qua such. If it appears that he seeks to exercise the right for some purpose that is in no wise connected with his interest as stockholder, but is entirely foreign to such interest, the court which is asked to issue mandamus upon the corporation to compel it to aid him in pursuing such purpose, not only has the right under the statute to deny him the writ, but it is its duty in the exercise of a sound discretion to do so. We do not conceive that the bestowing by the statute upon the stockholder of this right gives to him a privilege that is his in his individual capacity. The right by the terms of the statute is given to the "stockholder"; and if it appears that it is sought to exercise the right not as a "stockholder," but in some capacity that is purely individual and in no way germane to the relationship of stockholder to the corporation, then a case is presented which it never was the intention of the statute to provide for."

█ It is also clear that the Court can consider and balance the interest of the corporation as a unit against the stockholder's interest. "While it is the duty of the court to protect the rights of stockholders, it is equally their duty to safeguard the rights of the corporation as such." State ex rel. Cochran v. Penn-Beaver Oil Co., 4 W.W. Harr. 81, 143 A. 257, 260 (Super.Ct.1926). A shareholder has a right "to inquire into the value of his investment, provided his purpose be proper, unless an injury to the corporation or other stockholders can be shown in the granting of such request." State ex rel. Waldman v. Miller-Wohl Co., 3 Terry 73, 28 A.2d 148, 153 (Super.Ct. 1941).

█ Finally, as background, it is important to allocate the persuasion burden. Judge Terry in State ex rel. Waldman v. Miller-Wohl Co., Id. at 28 A.2d 153 said:

"It must be borne in mind that the writ is not issuable as a matter of course; on the contrary, it is issued only upon sound judicial discretion—consequently, it is mandatory upon the relator seeking the examination not only to allege, but, in my opinion, to prove a proper motive or purpose, which would properly cause the Court to exercise its judicial discretion in his favor."

I now turn to the merits of the case, as presented by the record. As to the information sought, the request is broad. I think it fair to say that the trial record effectively narrows the dispute to specific items which Armour desires to see. Indeed, the demand is necessarily limited by the alleged purpose. I will consider the demand as limited in the light of the full record.

First, Armour desires to see the following items which Lithium made available to Gulf or documents of Gulf summarizing the information in the following items:

1. The two volume report of A. D. Little, costing Lithium and its joint venturer $50,000. It includes a marketing study for certain products anticipated from the Great Salt Lake project. It also included a volume of technical information.

2. Two extensive reports prepared by Stearns Rogers Corporation covering Lithium's potash and salt cake plants, costing Lithium and its joint venturer between $50,000 and $60,000. The potash and salt cake plants are half of the capital investment at Great Salt Lake.

3. An extensive study of the pond system at Great Salt Lake prepared by International Engineering Company and Arthur G. McKee, costing Lithium and its joint venturer between $140,000 and $150,000. The pond system is the second major item in the capital investment at Great Salt Lake.

4. Task reports prepared by Lithium itself, including reports on every research and development task carried out by the joint venture in the two years of its existence.

5. Marketing surveys concerning potassium chloride and potassium sulfate prepared by Salzdetfurth, the parent of Lithium's joint venturer.

6. Other data on the Great Salt Lake project including documents dealing with land and mineral rights, depletion, and lengthy periodic economic evaluation of the engineers of the joint venture. The later evaluations include estimates of markets, market prices, capital costs and operating costs.

7. Certain requirement contracts between Lithium and Dow, the contents of which have been considered by the two companies as confidential.

8. A Chase Manhatten report concerning prospects for the lithium industry and Salt Lake venture as related to the fertilizer picture.

9. The results of Lithium's research effort at Bessemer City, North Carolina, where its lithium chemical operations are located.

The key to the Lithium information is the Great Salt Lake project and evaluation of changes for success. Specifically, Armour wants to know how Lithium can expect to produce between 225,000 and 250,000 tons of potassium sulfate annually, as has been asserted by the President of Gulf.

Secondly, Armour wants, although not precisely stated in the letter of demand, studies that Gulf itself made concerning Lithium. These include the following:

1. A report by Mr. F. G. Spencer, a consultant hired by Gulf, on the technical side of Lithium's operations including both the Salt Lake venture and the North Carolina operation.

2. Memoranda submitted to Gulf by Bear, Stearns and Company on Lithium and Gulf.

3. A forecast and reports by Arthur Anderson & Company and Gulf's own personnel on Lithium.

4. A report of Underwood-Neuhous & Company with respect to the stock values of the merger.

5. A yellow bound report prepared for use of Gulf's Board of Directors meeting on January 26, 1967, when the Lithium merger proposal was considered. This report included substantial information from the Little report and the Spencer report. It is a comprehensive study of the merger and includes five year forecasts, stock value forecasts, an analysis of Lithium currently, an analysis of the Salt Lake venture including prospective products and markets.

Thirdly, Armour wants all information Gulf has concerning the mineral resources of Gulf and its subsidiaries since January 1, 1960. These include geological surveys in Mexico, some of which are not public information.

Fourthly, Armour wants to see the books of account of Gulf and its subsidiaries.

The core of this general area is the cost data on Gulf's Mexican operation.

Fifthly, Armour wants to see the minutes of the Board and Executive Committee of Gulf and its subsidiaries since 1963. It seems fair to say that this request is being made for any supplementary information which may relate to the other items of specific intent being requested.

Armour's desires can be summarized as follows. It wants all the information Gulf has on the Salt Lake venture and has some passing general interest in Lithium's North Carolina operation. It wants detailed information on Gulf's own Mexican operation and, particularly complete information on mineral reserves and cost data. Both sides acknowledge in the record that this information is the heart of Gulf. To the extent the letter of demand requests additional information, it can be ignored because such additional information is largely unimportant to either side and, to the extent it has any importance, it is readily available from other sources.

It is with the above background that the decision in this case must be made. In many respects, the traditional opinion language of these cases is unsatisfactory and inadequate to deal with the instant case. For there is in the traditional approach to the problem a suggestion that purpose is necessarily singular and even necessarily good or bad.

This case demonstrates that purpose need not be singular nor need a shareholder's actions be labeled abstractly good or bad. The men who run corporations in highly competitive businesses work for high stakes. And they work hard using every available tool at their command to achieve and protect competitive advantage. They work for the good of their own corporation.

Armour's aim in its shareholder venture into Gulf was sulphur. There can be no doubt about that. Armour was frustrated in its attempt to buy sulphur from Gulf. Then it determined to achieve a powerful shareholder interest in Gulf to gain leverage in order to achieve an association which would permit Armour to gain sulphur. Armour entered the Gulf Corporate entity less than a year ago with a large purchase of Gulf stock in a very limited period of time. And it entered at a time when the structure of Gulf was known to be in a state of some flux. Sulphur, not investment, was the purpose. And there can be no question but that Armour still has such a purpose and also still has a purpose to gain all the information it can about sulphur in Mexico and Gulf's sulphur production in Mexico.

This does not mean that Armour has acted wrongfully. Gulf is a publicly held corporation and it subjected itself to an interest like Armour's when it went public. Nor does this mean that Armour does not have any legitimate interest in the Gulf-Lithium merger. Armour has invested almost four million dollars in Gulf, perhaps unsuccessfully in the light of its goal. But, it is nevertheless a substantial investment which Armour does not want to see diluted. It should be remembered that Armour did test the market to see if it could successfully divest itself of its Gulf shares and the market reaction was unfavorable. It may be also that Armour for all practical purposes has made up its mind that this merger is not in its best interests. Even so, as a shareholder, Armour has a valid interest in learning all it can about the merger in order to effectively oppose it.

■ Thus, we have a situation that is not black and white and that does not fit neatly into the legal mold developed in a less complex era. The question basically is whether or not Armour has presented a case which should lead this Court to exercise its discretion in Armour's favor. I am satisfied that Armour has not presented such a case and that prayer of the complaint must be denied.

What is the case that Armour has presented? The following factors are the key to it.

■ First, Armour is a shareholder which has invested money and it has an interest in the value of its investment. As Judge Terry put it in *Miller-Wohl,* supra, at 28 A.2d 153:

" The shareholders of a corporation are the equitable owners of its assets. They have a well defined interest in its present and future welfare, including its entire policy of operation. "

In short, Armour is a shareholder claiming a traditional common law right. Its claim cannot be lightly dismissed.

Secondly, we are dealing with a merger which requires shareholder approval. Consequently, it is simply not a matter of general shareholder interest, but rather a matter of specific shareholder interest requiring shareholder action.

Thirdly, Armour is not a typical shareholder. It has at its command the means and the ability to make a sophisticated managerial judgment. There is no question that Armour within the corporate structure could make use of the information it gleaned, if only to more effectively oppose the merger.

Fourthly, the proxy statement, perhaps to some extent necessarily under SEC policies, does not provide Armour with the information it desires and could effectively use in evaluating the Great Salt Lake project.

Fifthly, part of the dispute between Armour and the current management of Gulf is inherent in corporate democracy. It may well be that Armour's position that a direct association with Armour with Mexicanization of Gulf's subsidiary is the best policy for Gulf. Armour certainly has every right to try to achieve a management which is favorable to its interest and to convince other shareholders that their interest lies with Armour.

Armour's case is not a poor one. It can fail to persuade only if the factors on the other side destroy its persuasiveness. In this case, the Court is satisfied that the opposing factors are overbalancing. The following opposing factors are relied upon.

■ First, Armour has for sometime been trying to ascertain the information developed by Gulf as to mineral reserves, geological studies and detailed operating costs in Mexico. This information is of great significance to Gulf which is operating with serious competition in a situation inherently vulnerable. This information is important to Armour in its capacity as a consumer of sulphur. Insofar as analyzing the economics of Gulf is concerned, the information is not necessary because the overall income and cost data is available to Armour through the proxy statement and other data. A stockholder may not enforce his right to inspect corporate books where he already has the information to which he is reasonably entitled. State ex rel. Miller v. Loft, Inc., 4 W.W.Harr. 538, 156 A. 170 (Super.Ct. 1931). Armour's purpose in having this information is for reasons independent of its status as a shareholder. It simply is unnecessary information in evaluating the merger.

■ Secondly, the Court cannot ignore the interests of Armour as a sulphur consumer. The facts are that Armour is a large consumer of sulphur produced in Mexico and that one of its leading suppliers, in the past and, after a gap, in the future, is a competitor of Gulf's in Mexico. Furthermore, Gulf has been a leading supplier of Armour's competitors. Armour recently has tried to induce Gulf to become one of its suppliers in a period of sulphur scarcity. Finally, there is evidence that Armour itself is open to the suggestion of producing its own sulphur within its own corporate structure. Gulf is entitled to the assurance that information disclosed to shareholders is not for the purpose of injuring the corporate business or building up a rival concern. State ex rel. Lindsay v. Jessup & Moore Paper Co., 7 Penn. 397, 72 A. 1057, 1059 (Sup.

Ct.1957). Insofar as the information relating to the details of Gulf's Mexican operation is concerned, it is apparent that the disclosure of this information would be contrary to the interests of Gulf under its current policy of management. With the added factor, cited above, that this information is not necessary in analyzing the economics of proposed merger, the case for non-disclosure clearly is the better one.

Thirdly, insofar as the information concerning Lithium and the Great Salt Lake project is concerned, it must be remembered that Gulf has contracted pursuant to a secrecy agreement not to disclose such information. Lithium has done all it can to maintain the confidentiality of its information and has disclosed such information only for business necessity. Contrary to the suggestion of Armour, it was obviously not the intention of the parties in entering that agreement to provide for disclosure of the information to Gulf's shareholders. Such contracts are common and important to viability of corporate relationships. The Court, if possible, should give strong consideration to a private contract of this kind, especially when a separate legal entity is inadvertently entangled within an intra-corporate matter. It may not always be possible to protect a company in Lithium's position, but it should be a factor entitled to some weight and such weight grows when any evil of disclosure is also present.

Fourthly, the relationship of the Great Salt project to Armour, independent of its stockholder status, must be borne in mind. One of the principal products anticipated from the operation is potash, both potassium chloride and potassium sulfate, for use as fertilizer. Armour, of course, is a leading producer of fertilizer and has a joint venture in Canada which operates a potassium chloride mine. The fertilizer business is highly competitive and is growing astronomically.

Fifthly, the information Lithium has as a result of its operations in Great Salt Lake has been acquired with a joint venture associate at a cost of three million dollars. The operation for mineral exploration of Great Salt Lake is itself a highly competitive one and one where the work product of skilled labor is a valuable asset. In a sense, Lithium, a stranger to the corporation stands to lose the only meaningful product of its venture and of its monetary expenditure. Its claim that the information should remain confidential is not only based on a contract, but on a substantial investment. This Court does not evaluate that investment one way or the other, but Lithium is entitled to market it for what it may be worth.

Sixthly, there are considerations which counter Armour's argument that the merger context is peculiar. Armour says that since a merger needs shareholder approval, shareholders have an unqualified right to all information possessed by their corporation relating to a proposed merger. It is not at all clear to this Court that the law intends a shareholder to be a corporate manager even in the merger context. Under our statute, the directors, or a majority of them, must initiate the merger which the shareholders adopt. The prime responsibility for development of a merger agreement necessarily rests with the directors. While the case of The Susquehanna Corporation v. General Refractories Company, 250 F.Supp. 797 (E.D.Pa.1966), mod. 356 F.2d 985 (3rd Cir. 1966) lends some support to the plaintiff's position, even the District Court in that case took pains to point out the lack of any necessity for confidentiality. This Court is not prepared to say that in every merger case a shareholder has an unqualified right to the same information seen by the directors. To do so would place a great burden on the desired freedom in business affairs. Indeed, it could be disastrous to have an absolute policy, even in the merger context, which would bear open every pertinent corporate file to any shareholder of

a publicly held corporation. There has been a policy of judicial discretion historically in this area and the modern corporate context increases the need for a close examination of each case. The shareholder right remains a qualified one, even in the merger context.

Seventhly, it should be noted that the law does not leave Armour helpless. Armour can oppose the merger and, unlike many other shareholders, has the means to do so. Armour can argue as part of that opposition the secrecy surrounding the Great Salt Lake project. And, if Armour fails to be successful in preventing the adoption of the merger plan, Armour can seek an appraisal. The handicap of non-disclosure therefore is hardly total.

Eighthly, as to Lithium's North Carolina operations, there has been very little said directly. It would seem, however, that the published data on this separate portion of the business amply discloses its history and any general appraisal of the Lithium industry would fill the gap. There has been no stockholder purpose shown for the detailed disclosure of this information.

In summary, the case is not a clearcut one. It would be artificial for the Court to say that Armour does not have any legitimate interest as a shareholder in evaluating this merger. But it would be equally artificial to say that Armour has no desire to obtain the information it seeks except in its role as a stockholder. Once the black and white approach is eliminated, one must analyze what Armour wants, as shown by the whole record, and evaluate it with the purpose served by its disclosure. If this is done, the problem is reduced essentially to the Great Salt Lake project. It is only in that area where Armour's de-sires for information can be successfully coupled with its shareholder status in any meaningful way. And, even there, considering the circumstances surrounding Armour's entry into Gulf, the risk of harm to Gulf and Lithium by disclosure, and the circumstances under which Gulf got the information, I am satisfied that the factors cited above outweigh the interest of Armour in having the information. Stated simply, it seems to me that, under all the circumstances here presented, justice is better served in this case by the protection of the confidentiality of the Great Salt Lake project than by its disclosure to this shareholder.

The case is here in the limited context of mandamus. Each such case necessarily must be decided on its own particular facts. The facts here are somewhat unusual and they must be weighed as a whole and not given undue significance in isolation. And, while the Court has considered a lengthy record and a wide variety of circumstances, it should also be remembered that the remedy sought, shareholder inspection, is a confining one. Since there are rather complicated legal actions pending in other courts, I think it wise to state the obvious. I have only dealt with the question of whether or not a writ of mandamus should issue to compel production of information for shareholder inspection. I make no other determination. In the exercise of the discretion granted to this Court under law, Armour has failed to convince me that the Court's judicial discretion should be exercised in Armour's behalf.

The plaintiff's prayer that this Court issue a writ of mandamus is denied. The writ is refused. It is so ordered.