**H. P. SKOGLUND and Barry Ackerley, Plaintiffs,**

v.

**ORMAND INDUSTRIES, INC., Defendant.**

Court of Chancery of Delaware, New Castle County.

Submitted Oct. 15, 1976.

Decided Dec. 3, 1976.

Bruce M. Stargatt and Edward B. Maxwell, 2nd, of Young, Conaway, Stargatt & Taylor, Wilmington, and William P. Frank, Douglas M. Kraus and Robert E. Zimet, of Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiffs.

Louis J. Finger and Stephen E. Herrmann, of Richards, Layton & Finger, Wilmington, and Sheldon D. Camhy, of Shea, Gould, Climenko, Kramer & Casey, New York City, for defendant.

BROWN, Vice Chancellor.

At all times pertinent to this action the plaintiff H. P. Skoglund was and is now the record and beneficial owner of 79,600 shares of the common stock of the defendant Ormand Industries, Inc., a Delaware corporation. Likewise, the plaintiff Ackerley was and is now the record and beneficial owner of 11,000 shares of such stock. On August 4, 1976, plaintiffs made a written demand upon the defendant corporation pursuant to

8 *Del.C.* § 220 for examination, inspection and copying of a list of its common stockholders as well as certain books and records of the corporation. The corporation rejected the demand and plaintiffs promptly brought this suit to compel inspection. This is a decision after trial.

The statute makes it clear in all such cases that the right of a stockholder to inspect the stock list and books and records of his corporation is measured by the propriety of his purpose. The test for a "proper purpose" is that it be "reasonably related to such person's interest as a stockholder." 8 *Del.C.* § 220(b). Where the stockholder seeks to inspect the corporation's books and records, other than its stock ledger or list of stockholders, he must first establish to the satisfaction of the Court that he seeks the inspection for such a proper purpose. Where he seeks inspection of the stock ledger or list of stockholders the burden of proof is placed upon the corporation to establish that such inspection is sought for an improper purpose. 8 *Del.C.* § 220(c). If a proper purpose is established, it is no defense of itself that the stockholder may also have another, or secondary purpose which may be improper. *Western Air Lines, Inc. v. Kerkorian*, Del.Supr., 254 A.2d 240 (1969); *General Time Corporation v. Talley Industries, Inc.*, Del.Supr., 43 Del.Ch. 531, 240 A.2d 755 (1968); *Mite Corporation v. Heli-Coil Corporation*, Del.Ch., 256 A.2d 855 (1969). However, even though the purpose may be proper in the sense that it is reasonably related to the person's interest as a stockholder, it must also not be adverse to the interests of the corporation. To this extent a stockholder's right of inspection is a qualified right depending upon the facts of the particular case. *State v. Loft, Inc.*, Del.Super., 4 W.W.Harr. 538, 156 A. 170 (1931); *State v. Gulf Sulphur Corporation*, Del.Super., 233 A.2d 457 (1967). In this case the defendant corporation charges that the plaintiffs' motivation in seeking inspection is improper for several reasons. Consequently, it is within the framework of the above principles that the evidence must be evaluated.

To begin with, it is no secret that the plaintiffs, along with several other interested persons, seek to gain control of the defendant corporation (hereafter "Ormand") and to oust its present management. Plaintiffs' group has filed a 13D statement to this effect with the Securities and Exchange Commission.

Ormand operates in California and has three separate facets of business. One is in the field of communications, or outdoor advertising, which it conducts primarily in the Los Angeles and northern California areas. The advertising business is conducted through a 93 per cent owned subsidiary, Ormand Communications, Inc., which in turn operates through its subsidiary corporations, Ryan Outdoor Advertising, Inc. and Kennedy Outdoor Advertising. In addition Ormand has a packaging division engaged in the manufacture and distribution of metal containers through several other subsidiary corporations. A third division is involved in oil field service operations.

Ormand has some 1,900,000 shares of common stock outstanding. The corporation is controlled by Jarrell D. Ormand who, along with members of his family, owns or controls approximately 20 per cent of Ormand's common shares, exclusive of unexercised options to purchase. In all, the Ormand family and the present directors own 35 per cent of the stock entitled to vote for the election of management. Jarrell D. Ormand is also chairman of the board and chief executive officer of the corporation.

Plaintiff Skoglund is an eminently successful businessman who first became a stockholder of Ormand in July 1972. Plaintiff Ackerley is a business associate of Skoglund who first acquired his Ormand shares in May 1975. In the past Skoglund has bought and sold several communications corporations engaged in the outdoor advertising business. Ackerley also has knowledge and experience in the communications business and presently heads Ackerley Communications, Inc., a closely held Seattle outdoor advertising company in which Skoglund is a major shareholder. Having followed the progress of Ormand somewhat

closely since becoming shareholders plaintiffs rely on three distinct factors as justification for their inspection demand.

First, based upon their personal knowledge and expertise in the outdoor advertising business, coupled with an examination of the financial information contained in Ormand's annual reports, plaintiffs contend that Ormand's outdoor advertising subsidiary, which forms a significant part of Ormand's operation, is being mismanaged at best and, in all likelihood, is being looted. According to Ackerley, Ormand's net income of $35,000 on $6.25 million of outdoor advertising sales, as reflected in the 1975 annual report, is unbelievable and indicates that something is terribly wrong. Ackerley also finds the lease cost of advertising space of 17 per cent to 18 per cent, again as computed from the annual report figures, to be far out of line with industry standards. Plaintiffs say that unless they are permitted an examination of the corporate books and financial records, there is no way they can ascertain where the money is going and for what.

Second, plaintiffs rely on various public disclosures by Ormand which, to them, indicate questionable, if not improper, transactions. For one thing, in July 1971, Jarrell Ormand personally purchased a business named Ana Maria Cosmetics and at the same time granted Ormand an option to purchase the company from him at his original cost. Several months later Ormand exercised this option, thus taking Jarrell Ormand out of his investment at his original cost. Some months after that Ormand sold Ana Maria Cosmetics. According to the 1973 annual report Ormand suffered a combined loss on the operation and sale of Ana Maria and another subsidiary of over $500,000. Plaintiffs are also concerned by proxy statement information initially indicating a proposed issuance of 17,142 shares of stock to Jarrell Ormand for a consideration of $45,000, but which he ultimately acquired at the rate of $1.00 per share. Another disclosure in the 1976 proxy statement troubles plaintiffs with regard to the issuance of convertible debentures by the corporation to Jarrell Ormand.

The third and significant factor which plaintiffs say has prompted them to act stems from a meeting by Ackerley with one Robert M. Brunson, former president of Ormand's communications subsidiary. Brunson had resigned his position ostensibly because of improper manipulations of corporate finances by Jarrell Ormand which he could not ignore. Brunson produced a list of alleged improprieties including the use of Ormand funds for numerous of Jarrell Ormand's personal expenses, including some $50,000 to $75,000 for work on his private residence. An Ormand employee charged to the company's payroll is said to have actually worked at Jarrell Ormand's home. Corporate credit with advertising customers was allegedly used for the personal benefit of Jarrell Ormand, his family members and certain of his personal friends. And at least seven members of Jarrell Ormand's family are said to be on the corporate payroll, with plaintiffs having doubt as to the value of services rendered by some of them. While plaintiffs acknowledge that the $100,000 or so involved in the matters revealed by Brunson may be a mere drop in the bucket concerning the overall mismanagement they fear, they nonetheless feel that as shareholders they have a right to examine the corporate records to ascertain the accuracy of the charges and to contact other shareholders concerning their findings.

Plaintiffs' letter demanding inspection, which was rejected by Ormand, set forth some twenty different categories of documents which plaintiffs desired to see. Basically all but three of these deal with specific events or items which plaintiffs either culled from public corporate disclosures or which brought to their attention by Brunson. A sampling of these has been referred to previously herein. The other three constitute a general demand to inspect all minute books concerning directors' meetings and committees thereof of Ormand and all its subsidiaries, together with all internal corporate financial records not on file with

the Securities and Exchange Commission, from the period of January 1, 1973, to the present. As the trial commenced, counsel for Ormand announced that the corporation was amending its answer in open court so as to permit the inspection of thirteen of the categories. In essence, it was acknowledged that subject to certain restrictions, inspection would be permitted as to any category of the demand dealing with or relating to personal transactions involving the Ormand family. The balance of the demand, however, was resisted for the following reasons.

To begin with, Ormand contends that under Delaware law a shareholder may not review generally all books and records of his corporation, but rather is limited to those pertaining to the specific matters on which he has based his right to inspect. In addition, Ormand argues that plaintiffs' demand is not made in good faith and that they come to court with unclean hands. Reliance is also placed on the fact that plaintiffs are in a competitive position with Ormand because of their outdoor advertising interests in the Seattle area. Finally, Ormand contends that on the evidence presented plaintiffs have admitted that they have no immediate or future need for the list of shareholders. I will deal with these defenses after setting forth the facts on which Ormand relies, as I find and understand them.

Ormand asserts that Brunson is actually motivated by bad blood between him and Jarrell Ormand over a personal matter. It is also asserted that Brunson is now acting in concert with plaintiffs' group whose real purpose is to take over Ormand by means of forcing Jarrell Ormand and his family members to sell their stock to plaintiffs' group. It is argued that plaintiffs are compelled to go this route because the size of the holdings of the Ormand family make a takeover through a proxy fight or tender offer an unrealistic prospect. Moreover, Ormand claims that certain members of plaintiffs' group have previously seized control of another corporate enterprise by just such a pressure ploy.

During 1973 plaintiff Skoglund met with Jarrell Ormand. Skoglund recalls that his purpose was to express his dissatisfaction with the company's performance. Mr. Ormand recalls that Skoglund was suggesting the sale of some of his advertising properties to Ormand by insinuating the possibility of a proxy fight or tender offer in the event Ormand was not interested. Nothing materialized from this meeting. However, the two met again in 1974. This time, according to Mr. Ormand, Skoglund was interested in purchasing his stock. Skoglund has no such recollection. Again nothing materialized.

During the middle of 1975, plaintiffs made contact with Brunson and learned of his information. Commencing in late 1975 and early 1976 plaintiffs developed contact with one George Cook, Sr., his son, Brad Cook, one John Murchison, and others, some of whom eventually came together in their common desire to gain control of Ormand. Based upon their knowledge of the factors on which plaintiffs seek to inspect here, a letter demanding the inspection was prepared, but was not executed. On July 29, 1976 Ackerley, along with Brad Cook and an attorney, attended the annual meeting of shareholders of Ormand. A copy of the unsigned demand letter was given to Jarrell Ormand along with a request to meet with him privately after the shareholders' meeting was over. At the shareholders' meeting itself plaintiffs made no mention of the letter or any of the alleged mismanagement on which they now rely.

At the subsequent private meeting with Jarrell Ormand, which Ackerley attended, it was made known on behalf of plaintiffs' group that they wanted Ormand's management and the members of the Ormand family removed if legal action was to be avoided. It was also indicated either in that meeting or in one the following day that some amicable arrangement concerning the acquisition of the Ormand family stock could be made in order to avoid a lawsuit and the accompanying unpleasantries it would entail. Plaintiffs' group representatives further indicated that they required

an immediate answer because they had to file their 13D statement the following week.

For some time prior to these events, Ormand had been considering the possible sale of its outdoor advertising division to a competitor, Combined Communications, Inc. In early August 1976, plaintiffs learned of the likelihood of such an imminent sale and, after first notifying Jarrell Ormand that they considered the sale to be for an improper purpose and to prevent them from exercising their rights as shareholders, plaintiffs eventually gave notice to Combined Communications that they considered the proposed sale to be a waste of Ormand's assets which they would seek to invalidate if it went through and if their ultimate inspection of Ormand's books should bear out their convictions.

Ormand makes reference to these factors, and also to the fact that plaintiffs made no effort to contact either the corporate directors or auditors about their information as to mismanagement, as a clear indication that plaintiffs' true purpose is to gain control of Ormand by means of a confrontation and threat rather than by recognized legal means and that they are attempting to utilize their right of inspection under 8 *Del.C.*, § 220 as a weapon in carrying out this plan.

### I.

Turning then to the issues joined by Ormand's defenses, I deal first with its argument that plaintiffs are not entitled to review all the minute books and all the corporate financial records of Ormand. Initially, I take note that inspection of all such records of Ormand is not sought; rather it is only such records covering the period of January 1, 1973 to the present, and thus the period during which the specific events questioned by plaintiffs occurred.

Ormand relies on three Delaware precedents, *Nodana Petroleum Corporation v. State*, Del.Supr., 11 Terry 76, 123 A.2d 243 (1956); *State v. Gulf Sulphur Corporation, supra*; and *Martin v. D. B. Martin Co.*, 10 Del.Ch. 211, 88 A. 612 (1913), as standing for the proposition that the right of a shareholder to inspect corporate books and records is limited to those documents relating to the specific matters stated by the shareholder in his demand letter. Otherwise, says Ormand, any specific allegation of wrong doing on the part of management will open the door to all books and records of the corporation, and consequently every derivative action hereafter will be accompanied automatically by a § 220 demand, with the shareholder pointing to the allegations of his derivative complaint as justification.

■ The foregoing authorities, however, as I read them, do not establish such an inflexible principle of our corporate law, even though they do indicate, as well they should, that shareholder inspection, if otherwise proper, should be reasonably confined to information concerning the event or circumstances which caused the shareholder to become interested in the first place. However, as noted by then Judge Quillen in *State v. Gulf Sulphur Corporation, supra*, in the area of inspection rights by corporate shareholders, there often occurs "a situation that is not black and white and that does not fit neatly into the legal mold developed in a less complex era." 233 A.2d 464. As in *Nodana* the evidence, as I view it, here tends to show that plaintiffs were not merely on a fishing expedition but that they had, in fact, some specific basis for their demand. I construe Ormand to have conceded this latter point by its last minute decision to no longer oppose plaintiffs' demand with regard to the various specific matters set forth in the demand letter. In any event the evidence bears it out.

Thus, by agreeing to the inspection of selected records as to certain matters while resisting a general inspection of the corporate minutes and financial records for the time span within which the matters enumerated in the demand letter took place, it seems that Ormand is attempting to reserve to itself the determination of what is essential and sufficient to supply plaintiffs with the information they seek.

■ While this might not be an inappropriate position to take and might well be

one with which the Court would agree were the demand addressed to an isolated transaction, such as the sale of a corporate asset or a pending merger, compare *State v. Gulf Sulphur Corporation, supra*, it cannot be overlooked that the reason for the demand here is to investigate the likelihood of general corporate mismanagement and improper transactions, a purpose which warrants inspection of books and records under our decisional law. *Nodana Petroleum Corporation v. State, supra*; *Henshaw v. American Cement Corporation*, Del.Ch., 252 A.2d 125 (1969).

From the evidence presented in this case, I am of the opinion that if the plaintiffs are otherwise entitled to inspection and examination of the corporate books and records for the purpose of ascertaining the possible existence of corporate mismanagement and waste, then their right should not be limited to those transactions and conditions which have been heretofore brought to their attention and which have aroused their suspicions. Rather it should extend to the corporate minutes and financial records in general during the period into which they seek to inquire, especially where the time span is reasonably related to the specific events cited as the basis for the demand. Particularly in such a situation as this the right should not be limited by the decision of present management that plaintiffs may inspect some records for this purpose, but not others. Compare *State v. Jessup & Moore Paper Co.*, Del.Super., 4 Boyce 248, 88 A. 449 (1913) for a similar conclusion as to a demand to inspect corporate records in order to establish the value of corporate stock.

## II.

I turn next to Ormand's contention that inspection should be denied due to the ownership interests of plaintiffs in other outdoor advertising businesses. On this point Ormand relies on the assertion that Ackerley and Skoglund, because of their ownership interests in other outdoor advertising concerns, are in a competitive posture to the outdoor advertising interests of Ormand.

Relying on *State v. Gulf Sulphur Corporation, supra*, Ormand argues that inspection of the corporate books and records, beyond that which Ormand is willing to provide voluntarily, should be denied so as to provide "the assurance that the information disclosed to shareholders is not for the purpose of injuring the corporate business or building up a rival concern." 233 A.2d 465. However, I view *Gulf Sulphur* to be distinguishable upon its facts when compared to the evidence here.

In that case the court observed that the shareholder seeking inspection, Armour and Company, had acquired a substantial interest in Gulf Sulphur, a sulphur producing corporation, because of Armour's own need to acquire additional sources of sulphur supply. Armour sought to inspect the books of Gulf Sulphur with regard to the latter's proposed merger with a third corporation. Because of the exchange of information pertaining to the proposed merger, Gulf Sulphur's records necessarily contained data pertaining to the mineral reserves of the third corporation as well as to those of Gulf Sulphur. From the evidence the court was persuaded that Armour's real interest was in sulphur more so than in the terms of the proposed merger and that consequently the information which Armour sought as a stockholder of Gulf Sulphur was for reasons independent of its status as a stockholder. On balance the court denied the demand for inspection.

Here plaintiffs have offered evidence to justify their concern as stockholders in the management of Ormand's business, and I am not persuaded that they are using this as a guise to obtain otherwise confidential information concerning Ormand's operation of its outdoor advertising interests. While some information best unseen by competitors may well come to their attention by inspection, the unfortunate fact of the matter is that it is within Ormand's advertising operation that plaintiffs suspect the majority of the mismanagement to be taking place. Moreover, plaintiffs are not directly competing in the same local market area as Ormand since their main outdoor advertis-

ing interests are being conducted in Seattle, and it is their very experience in outdoor advertising which they feel qualifies them to question the propriety of Ormand's similar activity. In addition, the expert witness called by Ormand was compelled to admit that as a part of the proposed sale by Ormand of its advertising subsidiaries the prospective purchaser, Combined Communications, which is a direct competitor in the same market area, would have to examine the pertinent books and records of Ormand before deciding on whether or not to go through with the acquisition.

 In *E. L. Bruce Co. v. State*, Del. Supr., 1 Storey 252, 144 A. 533 (1958) it was held that the fact that a shareholder is a competitor of the corporation does not of itself defeat the statutory right of inspection. Its misuse of the information obtained threatens harm to the corporation, it has a remedy in the courts in an appropriate action. Compare also *Credit Bureau of St. Paul, Inc. v. Credit Bureau Reports, Inc.*, Del.Ch., 290 A.2d 689, aff'd., 290 A.2d 691 (1972). I conclude that the ownership interests of plaintiffs in other outdoor advertising companies is not sufficient under the facts presented to defeat their right of inspection.

### III.

I next consider Ormand's argument that inspection should be denied because of the bad faith plaintiffs have displayed and because they come to a court of equity with unclean hands. In summary, Ormand contends that plaintiffs' failure to take any normally expected action in regard to their belief of mismanagement and waste, through tender offer, proxy fight, notice to the corporate auditors, notice to other stockholders, or notice to the board of directors or management, coupled with their use of the document demand as a measure to persuade Jarrell Ormand to sell his stock, shows an overriding improper purpose and bad faith which requires denial of the demand. For this proposition Ormand relies on *State v. Jessup & Moore Paper Co.*, *supra*, and *State v. United Brokerage Co.*, Del.Supr., 6 Boyce 570, 101 A. 433 (1917).

In the former the defendant corporation charged that the inspection demand was not made in good faith but rather it was intended to involve the corporation in harassing and annoying litigation and to so disrupt its business affairs that persons heavily interested in its welfare as stockholders might be compelled to purchase plaintiff's shares as the price of peace. While the court there found that the corporation could not substantiate this allegation, it did state as follows at 88 A. 450:

> "Bad faith and improper motive of the kind alleged, would, if true, deprive the [plaintiff] of any right to inspect the books of the corporation of which it is a stockholder . . . ."

Again, in *United Brokerage*, the record indicated that the plaintiff shareholder, as a form of counter attack to separate charges made against him by the corporation, threatened to exercise his right of inspection to gain information to be used in bringing suits to annoy and harass the corporation unless either the corporation or its principal shareholder would agree to purchase plaintiff's stock at the price he wanted. In denying the relief the court observed that plaintiff's likely motivation to bring harassing and vexatious litigation would be hostile to the best interests of the company and the other shareholders. Ormand contends that the only difference between this case and *United Brokerage* is that here plaintiffs, through the exercise of their claimed right of inspection, are attempting to coerce Jarrell Ormand into selling his stock to their group as opposed to forcing others to buy out their interests. The principle, Ormand argues, is the same and thus inspection should be denied.

 From the evidence in this matter, however, I am not convinced that the purpose of plaintiffs is to seek information upon which to base a suit which could properly be termed vexatious. From the deposition of Jarrell Ormand and another director, which were admitted in evidence, there appears at least some reason to be-

lieve that certain of the information offered by Brunson has a factual basis which can either be confirmed or clarified from the corporate records. To the extent plaintiffs seek inspection as stockholders in order to protect their interests in the corporation, I fail to see how they can be judged as proceeding in bad faith. Moreover, they have made no secret of the fact that their group seeks to gain control of Ormand, and to this end they have made filings with the Securities and Exchange Commission. And, to the extent that they may have such a secondary purpose as to which Ormand feels they are proceeding improperly, it is well established by our precedents that it does not defeat their right to inspection which is otherwise justified. On the facts of this matter, I conclude that *State v. United Brokerage Co.* is also distinguishable and not controlling.

As to the defenses of unclean hands, it was recently held by former Chancellor Quillen in the unreported decision of *DPF, Inc. v. Interstate Brands Corp.*, Del. Ch., C.A. 4856, October 2, 1975 [reported unofficially at 1 Del.J. of Corp.L. 458] that where it was conceded by the pleadings in a § 220 proceeding that the plaintiff was a shareholder at the time of the events as to which inspection was sought, an affirmative defense based on the clean hands doctrine was immaterial and subject to a motion to strike. Also, the purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy. *Bodley v. Jones*, Del.Supr., 30 Del.Ch. 480, 59 A.2d 463 (1947). On the evidence presented I do not find the conduct of the plaintiffs to be so shocking to the integrity of the Court as to require the doctrine to be invoked against them.

## IV.

Finally, while Ormand is willing to make its stock list available to plaintiffs under certain conditions, it disputes that plaintiffs are entitled to have it as a matter of right under § 220. In their demand letter plaintiffs stated that the list of stockholders

> ". . . is requested for the purpose of enabling the undersigned to communicate with other Ormand stockholders on matters relating to their interest in Ormand, including, among other things, the desirability of changing the composition of the Board of Directors of Ormand."

Ormand relies on three factors which it claims are uncontested in the record. First, the demand was purposely made after the regularly scheduled shareholders meeting on July 29, 1976. Second, plaintiffs have stated that they are not interested in mounting a proxy contest. Third, plaintiffs have stated that they are not interested in making a tender offer for Ormand stock. This, Ormand says, puts the matter squarely within the holding of *Weisman v. Western Pacific Industries, Inc.*, Del.Ch., 344 A.2d 267 (1975).

In *Weisman* the plaintiff sought a list of stockholders

> ". . . to communicate with other holders of shares of WPI's common stock with respect to the management of WPI and the conduct of its affairs."

The Court found this to be unspecific as to purpose standing alone. It also found that there were no surrounding circumstances, such as an impending shareholders meeting, tender offer, etc., which would support an expanded reading of the demand in light of such circumstances. Accordingly, the relief was denied, the Court stating as follows at 344 A.2d 269:

> "Thus, it would appear clear that when an unspecific demand unrelated to an imminent stockholders meeting or a tender offer or the like which will affect plaintiff's interest as a stockholder is made as here . . . such an unspecific demand fails to meet the strict requirement of the statute . . . ."

Ormand contends that the demand here is equally unspecific and, by plaintiff's own admission, unrelated to an impending event.

Thus it asserts that it has shown that the list is sought for no proper purpose under *Weisman*.

This seems to highlight Ormand's approach to the defense of this case. With admirable ingenuity it seeks to isolate certain matters from the whole and then treat them as if they existed in isolation. As to the books and records demand, Ormand at the last minute attempted to concede the inspection as to certain specific matters without really admitting that plaintiffs were legally entitled to it. Then, as if these matters never existed, it proceeded to attack plaintiff's remaining general demands for certain records as being too broad. As to the stock list demand, it culls the purpose paragraph from the demand letter and says that it is unspecific because it fails to relate to anything definite that is about to happen. While *Weisman* is undoubtedly correct on its facts, it does not support what Ormand is attempting to do here, as I view it.

 In *Weisman*, as it is reported, there was a demand for a stock list only, with no accompanying demand to examine books and records. Here plaintiffs demanded both and did so by means of an eleven-page, single spaced letter containing eight pages of itemized matters and events comprising more than a dozen separate areas of inquiry into the books and records of the corporation for the stated purpose of investigating the affairs of the corporation and its subsidiaries for possible mismanagement, waste and/or misappropriation. The same letter demanded the stock list so as to communicate with other shareholders on matters relating to their common interest, including, among other things, the desirability of changing the board of directors. I do not feel that the demand for the stock list has been made in a vacuum without regard to any related surrounding circumstances. So viewed, I conclude that Ormand has failed to establish under 8 *Del.C.*, § 220(c) that plaintiffs seek the stock list for an improper purpose.

On the other hand, I am satisfied that plaintiffs have established a proper purpose to support their demand to examine the books and records of the corporation for the time period stated, and that the propriety of or motivation behind any accompanying purpose is not sufficient to show either overriding bad faith on their part or imminent threat to the business interests of Ormand. I ask counsel for plaintiffs to submit a form of order, as to which I will hear argument if counsel for Ormand feels it necessary.