# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE UNITEDHEALTH GROUP, INC. SECTION 220 LITIGATION | ) ) | Consolidated C.A. No. 2017-0681-TMR |

## MEMORANDUM OPINION

Date Submitted:  February 16, 2018
Date Decided: February 28, 2018

Nathan A. Cook, GRANT & EISENHOFER P.A., Wilmington, Delaware; Jeroen van Kwawegen, Christopher J. Orrico, and David MacIsaac, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Norman Berman, Nathaniel L. Orenstein, and Mark A. Delaney, BERMAN TABACCO, Boston, Massachusetts; Jessica Zeldin and Bradford P. deLeeuw, ROSENTHAL, MONHAIT & GODDESS, P.A.; *Attorneys for Plaintiffs.*

R. Judson Scaggs, Jr., Lauren Neal Bennett, and Jason Z. Miller, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendant UnitedHealth Group, Inc.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case involves a demand to inspect the books and records of a health care company that allegedly overbilled Medicare. The plaintiffs seek to inspect numerous books and records of the company in order to investigate: (1) mismanagement or misconduct; (2) possible breaches of fiduciary duties; and (3) the independence and disinterest of the board. The demand draws from a complaint in a *qui tam* action that contains evidence obtained by the federal government after a five-year investigation, including depositions from twenty of the defendant's employees and the defendant's production of over 600,000 documents. The defendant argues that the plaintiffs are not entitled to inspection because they do not have a credible basis to infer wrongdoing or mismanagement based solely on the allegations in the *qui tam* action. The defendant also avers that the challenged activities are not illegal. Finally, the defendant argues that even if there is a credible basis to infer wrongdoing or mismanagement occurred, the scope of the inspection demand is too broad.

For the reasons stated in this memorandum opinion, I hold that the plaintiffs' demand states a proper purpose and a credible basis from which a court can infer that wrongdoing or mismanagement may have occurred, entitling them to inspect certain books and records. The plaintiffs have shown that some, but not all, of the books and records they request are necessary to investigate their proper purpose.

1

## I.  BACKGROUND

The facts in this opinion reflect my findings based on the parties' briefing, 104 documentary exhibits, and trial held on January 9, 2018.  I grant the evidence the weight and credibility that I find it deserves.[1]

### A.  The Parties and Relevant Non-Parties

Plaintiffs Amalgamated Bank,[2] Coral Springs Police Officers' Retirement Plan ("Coral Springs"), and Central Laborers Pension Fund ("Central Laborers") (collectively, "Plaintiffs") have been stockholders of UnitedHealth Group Inc. ("UnitedHealth" or the "Company") since approximately May 27, 2005, January 1, 2006, and May 9, 2006, respectively.[3]

Defendant UnitedHealth is a Delaware corporation headquartered in Minnetonka, Minnesota.[4]  UnitedHealth is the largest Medicare Advantage

---

[1]  Citations to the trial transcript are in the form "Tr. #."  Plaintiff Exhibits are cited as "PX #," and Defendant Exhibits are cited as "DX #."  Facts drawn from the Pre-Trial Stipulation are cited as "PTS ¶ #," and facts drawn from the Proposed Order are cited as "PTO ¶ #."

[2]  As Trustee for the LongView LargeCap 500 Index Fund, the LongView LargeCap 500 Index Veba Fund, the LongView Quantitative LargeCap Fund, the LongView Quant LargeCap Equity-Veba Fund, LongView LargeCap 1000 Growth Index Fund, and the LongView Broad Market 3000 Index Fund.

[3]  PTS ¶¶ 1, 3; PX 17 at 5; PX 18 at 7.

[4]  PX 18 at 7.

Organization, or Medicare beneficiary, in the United States, providing health and well-being services to individuals age fifty and older in all fifty states.[5]

Non-party Stephen Hemsley is the CEO and a member of UnitedHealth's board of directors.[6]

Non-party WellMed Medical Management, Inc. ("WellMed") is a large physician-owned practice management company operating in Texas and Florida. In 2011, UnitedHealth acquired WellMed.[7]

Non-party Ingenix, Inc. ("Ingenix") is a direct subsidiary of UnitedHealth and provides data services for the Company, including submitting claims to Medicare.[8]

### B. The Medicare Advantage Program

The Center for Medicare & Medicaid Services ("Medicare") is the administrator of the federal Medicare program, which provides Medicare benefits to elderly and disabled individuals.[9] The Medicare Advantage Program includes a provision that allows Medicare beneficiaries to enroll in managed healthcare

---

[5] *Id.* at 2–3, 7.

[6] *Id.* at 5.

[7] PX 8 at 13–14.

[8] PX 6 at 11; PX 8 at 11.

[9] PX 8 at 2; PX 18 at 2.

3

insurance plans that are owned and operated by private organizations.[10] These private organizations are called Medicare Advantage Organizations.[11] Medicare pays UnitedHealth and other Medicare Advantage Organizations fixed monthly amounts for each enrollee based on various "risk adjustment data."[12] These data are comprised of medical diagnosis codes that each enrollee receives, and the data fluctuate based on the severity of the diagnosis.[13] Medicare pays an additional fee for enrollees who receive specific and more serious diagnoses.[14] The adjustments are intended to ensure that Medicare Advantage Organizations such as UnitedHealth are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.[15]

All Medicare Advantage Organizations, including UnitedHealth, submit diagnosis codes with the risk adjustment data of the beneficiaries to Medicare for payment.[16] These diagnosis codes are created from the beneficiaries' medical

---

[10]     PX 8 at 2.

[11]     *Id.*

[12]     PX 18 at 3.

[13]     *Id.*; Pls.' Opening Br. 4.

[14]     PX 8 at 3; Pls.' Opening Br. 4.

[15]     PX 8 at 3.

[16]     *Id.*

4

encounters, such as hospital stays and office visits.[17]  In general, the more numerous and severe the conditions, the higher the risk score for the beneficiary, and the larger the payout to the Medicare Advantage Organization.[18]  The Medicare Advantage Program requires each Medicare Advantage Organization to submit diagnosis codes that are "unambiguously" supported by information included in the beneficiaries' medical records.[19]  Medicare requires Medicare Advantage Organizations to delete previously submitted codes that are either unsupported by the medical records or invalid diagnoses.[20]

## C.  The *Qui Tam* Action

In July 2017, Benjamin Poehling, former Director of Finance at UnitedHealthcare Medicare & Retirement UnitedHealth, a UnitedHealth subsidiary, filed a *qui tam* action (the "Poehling Complaint") against UnitedHealth.[21]  He alleged that since at least 2006, the Company has violated the False Claims Act[22] by

---

[17]     *Id.*

[18]     *Id.*

[19]     *Id.*

[20]     *Id.* at 20; PX 18 at 3, 29.

[21]     PX 6 at 1, 8; PX 8 at 8.

[22]     Under the False Claims Act, a certification is false when the Medicare Advantage Organization has actual knowledge of the falsity of the risk adjustment data or

improperly "upcoding" risk adjustment data and failing to delete incorrect diagnosis codes, which resulted in overpayments from Medicare.[23]  Shortly after, the Department of Justice (the "DOJ") intervened in that action, *United States ex rel. Poehling v. UnitedHealth Group, Inc.* (the "*Qui Tam* Action"),[24] alleging that since at least 2005, despite repeat warnings, UnitedHealth has violated both Medicare regulations[25] and the False Claims Act.[26]  The DOJ based its allegations on a five-year investigation that included depositions of twenty UnitedHealth employees and UnitedHealth's production of over 600,000 documents, including the Company's

---

demonstrates either reckless disregard or deliberate ignorance of the truth or falsity of the data.  PX 18 at 4; *see* 31 U.S.C. § 3729.

[23]    PX 6 at 4–6.

[24]    No. CV 16-08697-MWF (SSx).  The defendants in that action filed a motion to dismiss. *Poehling*, No. CV 16-08697-MWF (SSx) (Feb. 12, 2018).  The United States District Court for the Central District of California (the "Federal District Court") denied defendants' motion as to the First Claim for Relief (violation of the reverse false claims provision of the False Claims Act), Fifth Claim for Relief (unjust enrichment), and Sixth Claim for Relief (payment by mistake). *Id.*  The United States Government also intervened in another *qui tam* action, *United States ex rel. Swoben v. Secure Horizons*, No. CV 09-5013 JFW (JEMx), which has since been dismissed. PX 10 at 1; PX 18 at 2, 4; DX 22 at 10–11.

[25]    Medicare regulation 42 C.F.R. § 422.504 requires each Medicare Advantage Organization, as a condition of receiving payment, to "certify (based on best knowledge and belief) that the [risk adjustment] data it submits are . . . accurate, complete and truthful."  PX 18 at 3 (quoting 42 C.F.R. § 422.504(l)(2)).

[26]    PX 8 at 2–7; PX 18 at 2, 4.

6

internal emails, letters, audit reports, charts, attestations, policies, presentation materials, and memoranda.[27] Based on this evidence collected, Plaintiffs allege that Defendant overbilled Medicare by "hundreds of millions – and likely billions of dollars."[28]

Plaintiffs assert that Defendant engaged in upcoding risk adjustment data by deliberately leaving diagnosis codes regardless of whether an enrollee actually had or was treated for that diagnosis in order to receive additional payment from Medicare.[29] Plaintiffs claim UnitedHealth conducted upcoding primarily through its chart review program (the "Chart Review Program"), patient assessment forms (the "Patient Assessment Forms"), and doctor incentives.[30] For support, Plaintiffs point to the DOJ's allegations (the "DOJ Complaint") in the *Qui Tam* Action as well as the voluminous documents and testimony cited and attached to the DOJ Complaint.[31] A few examples include:

- Testimony from UnitedHealth's Vice President of Finance that in 2006, UnitedHealth implemented the Chart Review Program designed to

---

[27] PX 1 at 3; PX 8 at 27, 32, 34, 35, 49, 70; Pls.' Reply Br. 1.

[28] PX 18 at 4–5.

[29] Pls.' Opening Br. 8.

[30] *Id.*

[31] *Id.* at 31–32.

determine if the physicians' medical records supported the diagnoses that they reported to UnitedHealth, which revealed inaccurate data.[32]

- Testimony, audit reports, presentations, training guides, and email communications that revealed provider-reported diagnoses were invalid; in some cases, approximately thirty percent of the codes were invalid.[33]

- Memoranda that showed the Chart Review Program was originally designed to "look both ways,"[34] but because UnitedHealth would recover upwards of $450 in revenue per every $30 spent on a specific chart review, the diagnoses coders tasked with finding and deleting false codes were told to "look one way" in order to increase these payments.[35]

- Evidence that UnitedHealth created the Patient Assessment Forms, a program created to identify chronic conditions coded less frequently than their prevalence rates would indicate.[36] The program was designed to encourage doctors to enter codes for patients that were at all eligible for the diagnosis code.[37] UnitedHealth only distributed the Patient Assessment Forms to providers who were eligible for Medicare payments.

- Evidence that UnitedHealth entered into "gainsharing" agreements, which gave doctors incentive payments based on the revenues that

---

[32]    PX 8 at 26, 31.

[33]    *Id.* at 31–33.

[34]    *Id.* at 34.

[35]    PX 6 at 34; PX 8 at 40–49; PX 12 at 13.

[36]    PX 6 at 34–35.

[37]    *Id.* at 35.

8

UnitedHealth received from Medicare for treating those doctors' patients.[38]

- Testimony that internal audit programs revealed "faulty coding." When UnitedHealth employees found codes unsupported by actual diagnoses, they were told that UnitedHealth "did not have the resources [to remove or delete them]" before the final submission deadline.[39]

- A presentation that showed thirty-two percent of diagnosis codes under review were not supported by the beneficiaries' medical records.[40]

- Testimony that in 2010, UnitedHealth implemented risk adjustment coding and compliance reviews (the "RACCR Program"), a program designed to meet Medicare requirements of submitting accurate risk adjustment data.[41] This program revealed that more than forty percent of diagnosis codes were invalid.[42]

- Evidence that UnitedHealth excluded certain providers from the RACCR Program in order to reduce the number of deleted codes.[43]

- Evidence that the RACCR Program found diagnoses codes not supported by the medical records, but UnitedHealth did not always delete them.[44]

---

[38]    PX 8 at 64–65.

[39]    *Id.* at 31–32.

[40]    *Id.* at 32.

[41]    *Id.* at 37.

[42]    *Id.* at 38.

[43]    *Id.* at 65–66.

[44]    *Id.* at 67–68.

Plaintiffs' also allege that UnitedHealth, through its subsidiaries, WellMed and Ingenix, caused other Medicare Advantage Organizations to submit false risk adjustment claims.[45] In particular, WellMed and Ingenix allegedly pursued contracts with other Medicare Advantage Organizations that were designed to assist other Medicare Advantage Organizations in submitting false risk adjustment claims.[46] Examples of evidence supporting these allegations include:

- Testimony that UnitedHealth created WellMed's subsidiary, DataRap, a processing system that identified, processed, and submitted diagnosis codes for Medicare payment, in order to maximize its risk adjustment submissions without regard to their accuracy or eligibility.[47]

- Testimony that WellMed's practice was not to delete incorrect diagnosis codes from prior years.[48]

- Testimony that WellMed claimed Medicare payments for diagnoses codes it identified as fraudulent.[49]

- Evidence that WellMed set up at least two health plans to use DataRap for the purpose of submitting fraudulent diagnoses codes.[50]

---

[45]    Pls.' Opening Br. 13.

[46]    PX 8 at 32; Pls.' Opening Br. 13.

[47]    PX 6 at 62.

[48]    *Id.* at 63.

[49]    *Id.*

[50]    *Id.* at 64.

10

- Evidence that a Medicare Advantage Organization in Dallas, Texas paid WellMed a fee based almost entirely on the increase in UnitedHealth's risk score year after year.[51]

- Evidence that, as a selling point to other Medicare Advantage Organizations for its risk adjustment services, Ingenix would emphasize that more than thirty percent of provider-reported diagnoses were unsupported by the beneficiaries' medical records.[52]

- Emails from compliance personnel at Ingenix that acknowledged UnitedHealth risked having to return Medicare payments if it alerted Medicare of payments it received based on diagnoses that were not validated by beneficiaries' medical records.[53]

Further, Plaintiffs claim there is a credible basis to infer that at least ten senior executives and directors had actual knowledge of UnitedHealth's "widespread and systematic corporate misconduct."[54]  Some evidentiary examples to support this claim include:

- Reports given in mid-2010 to executives that showed risk adjustment data was over forty percent inaccurate in California and Texas because the "diagnoses were not supported by the beneficiaries' medical records or were uncertain or unconfirmed diagnoses."[55]

---

[51]  *Id.* at 26.

[52]  PX 8 at 32.

[53]  *Id.* at 33.

[54]  PX 1 at 2; PX 17 at 4, 9–10; PX 18 at 4, 8, 20; Pls.' Opening Br. 2, 20.

[55]  PX 8 at 36; PX 18 at 12.

- A report given in June 2010 to Hemsley, the CEO and a board member, and other members of the executive team that identified compliance as an important issue of immediate concern.[56] This report showed that UnitedHealth knew Medicare Advantage Organizations were liable under the False Claims Act for reporting and refunding overpayments in an untimely manner.

- A presentation given in November 2011 to Hemsley that noted, "the medical record is the 'source of truth' and that looking at this 'source of truth' had a negative revenue impact because comparing provider-reported diagnoses with the information in the providers' medical records resulted in having to delete some of their diagnoses."[57]

- A report given in October 2012 to executives, including the CFO of UnitedHealth, that showed over thirty-three percent of diagnoses reviewed were unsupported by the beneficiaries' medical records, even though the coded inputs received two separate reviews for accuracy.[58]

- Testimony that executives knew the Medicare advantage claims did not always match the medical record documentation.[59]

- A presentation to executives that indicated "'[p]rovider coding is highly inaccurate and incomplete' and that 'more than 30% of coded conditions are not supported by [Medicare] validation findings.'"[60]

---

[56] PX 8 at 36.

[57] *Id.* at 46–47.

[58] *Id.* at 54–55.

[59] PX 10 at 20; PX 18 at 12.

[60] PX 8 at 30; PX 10 at 20–21; PX 18 at 12 (quoting DOJ Compl. ¶ 93).

Plaintiffs argue that senior executives and members of the board either encouraged or deliberately failed to address the scheme to improperly increase Medicare payments.[61] Examples of evidence underlying this argument include:

- An email from the CFO of UnitedHealth's Medical Advantage that acknowledged "vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities."[62] In that email, he encouraged employees to "turn on the gas!" in order to increase revenue opportunities.[63]

- Evidence that executives knew that UnitedHealth would not delete or otherwise report to Medicare at least 100,000 invalid diagnoses in 2011 and 2012 encounters.[64]

- Evidence that UnitedHealth liberalized its coding policies to enable coders to identify *more* diagnoses when it did not achieve its expected return on investment from 2012 chart reviews.[65]

- A presentation given to executives that revealed UnitedHealthcare Medicare & Retirement would miss its 2014 target budget by half a billion dollars.[66] As a result, executives, including Hemsley, terminated audit programs that UnitedHealth had implemented in order to improve the accuracy of risk adjustment data. By terminating these programs, UnitedHealth could "cut the $500 million miss by $250 million by . . .

---

[61]  Pls.' Opening Br. 20–22.

[62]  PX 8 at 30; PX 14 at 2.

[63]  PX 14 at 2.

[64]  PX 8 at 56, 62.

[65]  *Id.* at 43.

[66]  *Id.* at 57.

not deleting the provider-reported diagnoses invalidated by its chart reviews."[67]

- A document that showed Hemsley and other executives knew that terminating these audit programs would enable UnitedHealth to achieve massive financial benefit in the second quarter 2014 earnings.[68]

### D.    Procedural History

On July 17, 2017, Plaintiff Amalgamated Bank sent a books and records inspection demand to UnitedHealth.[69]  On July 27, 2017, Plaintiff Central Laborers sent a books and records inspection demand to UnitedHealth.[70]  On August 7, 2017, Plaintiff Coral Springs sent a books and records inspection demand to UnitedHealth.[71]   On August 3, 2017, UnitedHealth rejected Central Laborers' demand.[72]   On August 8, 2017, UnitedHealth rejected Amalgamated Bank's demand.[73]  On August 14, 2017, UnitedHealth rejected Coral Spring's demand.[74]

---

[67]    *Id.* at 58.

[68]    *Id.* at 62.

[69]    PX 1 at 1.

[70]    PX 3 at 1.

[71]    PX 2 at 1.

[72]    PX 34.

[73]    PX 35.

[74]    PX 36.

14

On September 25, 2017, Amalgamated Bank filed a complaint pursuant to 8 *Del. C.* § 220 against UnitedHealth.[75] The next day, Plaintiffs Coral Springs and Central Laborers filed a complaint against UnitedHealth pursuant to 8 *Del. C.* § 220.[76] On October 11, 2017, this Court consolidated the Amalgamated Bank and the Coral Springs and Central Labors actions. This Court held trial on January 9, 2018. On January 31, 2018, Plaintiffs filed a letter to the Court attaching the federal district court's tentative ruling on UnitedHealth's motion to dismiss the *Qui Tam* Action. On February 2, 2018, Defendant also filed a letter urging the Court not to consider the tentative ruling in its decision. On February 13, 2018, Plaintiffs filed another letter attaching the federal court's final ruling, which denied UnitedHealth's motion to dismiss on three counts and granted the motion on three counts, with leave to amend. On February 16, 2018, Defendant filed a letter responding to Plaintiffs' letter and exhibit, urging the Court not to consider the final ruling in its decision.

## II.   ANALYSIS

Under Section 220 of Delaware General Corporation Law, stockholders of a Delaware Corporation have the right to inspect the books and records of a company

---

[75]   PX 17 at 1.

[76]   PX 18 at 1.

for any proper purpose.[77] A proper purpose includes "a purpose reasonably related to such person's interest as a stockholder."[78] "[A] stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence."[79]

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement constitutes a 'proper purpose.'"[80] The stockholder is not, however, "required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring."[81] Instead, a plaintiff who seeks to investigate wrongdoing or mismanagement must also show "'some evidence' to suggest a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred."[82] The "'credible basis' standard sets the lowest possible burden of proof."[83] The credible basis standard can be satisfied through

---

[77]    8 *Del. C.* § 220.

[78]    8 *Del. C.* § 220(b).

[79]    *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[80]    *Id.*

[81]    *Id.* at 123 (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co. Inc.*, 681 A.2d 1026, 1031 (Del. 1996)).

[82]    *Id.* at 118.

[83]    *Id.* at 123.

"documents, logic, testimony or otherwise."[84]  "The trial court may rely on 'circumstantial evidence,'" and "[h]earsay statements may be considered, provided they are sufficiently reliable."[85]

Plaintiffs seek to inspect books and records of the Company in order to investigate: (1) mismanagement by the directors and/or officers of UnitedHealth; (2) the possibility of breaches of fiduciary duty by directors and/or officers of UnitedHealth and its subsidiaries, including without limitation, Ingenix and WellMed; and (3) the independence and disinterest of the board of directors, including whether a pre-suit demand is necessary or would be excused before commencing any derivative action on behalf of the Company.[86]

---

[84] *Id.*

[85] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 778 (Del. Ch. 2016) (citing *Wal–Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014); *Thomas & Betts*, 681 A.2d at 1032–33; *Marmon v. Arbinet–Thexchange, Inc.*, 2004 WL936512, at *4 (Del. Ch. Apr. 28, 2004); *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 208–13 (Del. Ch. 1976)).

[86] PX 1 at 2; PX 2 at 1–2; PX 3 at 1–2.  Plaintiff Amalgamated Bank also listed the following purposes for investigation: "[t]o communicate with other stockholders regarding their investments in UnitedHealth;" "[t]o determine whether to organize a 'vote no' campaign against directors who may have behaved recklessly, negligently, or disloyally;" and "[t]o determine whether to seek an audience with the Board to discuss corporate governance reforms regarding the Company's diagnostic coding and risk adjustment programs."  PX 1 at 2; PX 17 at 19.  Aside from mentioning them in their consolidated pre-trial brief, Plaintiffs make no distinguishing arguments regarding the treatment of these additional purposes for investigation.  Pls.' Opening Br. 26.

Defendant here does not identify any deficiencies in the form and manner of the demand or challenge that a desire to investigate corporate wrongdoing is a proper purpose. Instead, Defendant argues that Plaintiffs cannot rely solely on the allegations in the *Qui Tam* Action as evidence to suggest a credible basis from which a court can infer that wrongdoing or mismanagement may have occurred.[87] Defendant further argues that there is no credible basis for investigation because the alleged conduct is not illegal.[88] Defendant also avers the scope of the request is too broad.[89] I address each in turn.

## A. Plaintiffs Have Shown a Credible Basis to Infer Wrongdoing

Defendant argues that Plaintiffs fail to state a credible basis to infer wrongdoing or mismanagement sufficient to warrant further investigation. In particular, Defendant asserts under *Graulich v. Dell Inc.*[90] that Plaintiffs cannot rely exclusively on a complaint that has not been found to state a viable claim as evidence of a credible basis of wrongdoing.[91] This challenge fails. While a complaint alone

---

[87]     Def.'s Answering Br. 18–20.

[88]     *Id.* at 18–19, 22.

[89]     *Id.* at 29–30.

[90]     2011 WL 1843813 (Del. Ch. May 16, 2011).

[91]     Tr. 79–81, 85; PX 34 at 1–2; PX 35 at 2; PX 36 at 2. At trial, Defendant argued that I should await a decision from the Federal District Court on the defendants' motion to dismiss the *Qui Tam* Action because if dispositive, granting books and records

18

may not show a credible basis, the DOJ Complaint includes documents and testimony provided by Defendant and Defendant's employees.[92] The allegations in the *Qui Tam* Action are based on depositions from twenty of Defendant's employees and Defendant's production of over 600,000 documents after the DOJ conducted a five-year investigation. Defendant does not contest that the Company provided this information to the DOJ.

The DOJ Complaint includes references to, and quotations from, the Company's internal emails, letters, audit reports, charts, attestations, policies, presentation materials, and memoranda. These documents suggest that Defendant's senior executives, including Hemsley, were involved in meetings and presentations that revealed the codes submitted to Medicare for reimbursement were inaccurate.

---

when another court dismissed the relied upon complaint would be a waste of resources. Tr. 81, 93–95, 134. After that court denied the motion—in part—Defendant now asserts that I should not consider the ruling as a basis for my decision in this action. Def.'s Letter 1–2 (Feb. 6, 2018). The Federal District Court's ruling in the *Qui Tam* Action does not alter my holding.

[92] This Court has held that a plaintiff fails to state a credible basis for the Court to infer wrongdoing when the plaintiff relies solely on the fact that others have sued the company. *Graulich*, 2011 WL 1843813, at *5 n.49. This case, however, is distinguishable. Here, Plaintiffs provide detailed allegations of wrongdoing, including testimony from numerous employees and several documents demonstrating the board's knowledge of inaccurate billing practices. PX 8 at 25–74; PX 17 at 4. Simply because the testimony and documents are available in a complaint does not forbid the Court from examining them to determine if there exists an inference of wrongdoing.

19

The evidence also suggests that Defendant did not engage in steps to correct the inaccuracies or alert Medicare of the previous payments it received based on faulty coding. Instead, the Company removed audit programs designed to catch inaccuracies, such as the Chart Review Program, in order to avoid missing a $250 million payout from Medicare for 2014. The documents uncovered by the DOJ's lengthy investigation, coupled with the sworn testimony and statements of Defendant's own management, are enough to meet the "lowest possible burden of proof" in Delaware law.[93] Therefore, even if a complaint alone is insufficient, Defendant cannot escape the testimony and documents that demonstrate a credible basis for this Court to infer possible wrongdoing or mismanagement simply because they are referenced in a complaint.

Defendant further asserts that the DOJ Complaint cannot show a credible basis for wrongdoing or mismanagement because the underlying conduct is not illegal or fraudulent.[94] These are merits-based defenses that require I analyze the strengths and weaknesses of the underlying *Qui Tam* Action and potential derivative claims. This Court has repeatedly stated that a Section 220 proceeding does not warrant a

---

[93] *Seinfeld*, 909 A.2d at 123.

[94] Tr. 134; PX 34 at 1–2; PX 35 at 2; PX 36 at 2; Def.'s Answering Br. 18–19, 22, 26.

trial on the merits of underlying claims.[95]  Indeed, as this Court noted, "the Delaware Supreme Court has made it clear that the public policy of this State is to encourage stockholders to utilize Section 220 *before* filing a derivative action . . . in order to meet the heightened pleading requirements . . . applicable to such actions."[96]  I decline Defendant's invitation to make merit-based determinations on whether Defendant's behavior is actually wrongful or violates the law.  Plaintiffs have alleged facts sufficient to infer that Defendant may have violated Medicare regulations and the False Claims Act by overcharging Medicare.  Thus, Plaintiffs have stated a credible basis sufficient to warrant inspection.

---

[95]  *E.g.*, *Lavin v. W. Corp.*, 2017 WL 6728702, at *1 (Del. Ch. Dec. 29, 2017) ("Any contrary finding would invite defendants improperly to draw the court into adjudicating merits defenses to potential underlying claims in order to defeat otherwise properly supported Section 220 demands."); *Okla. Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2014 WL 5351345, at *6 (Del. Ch. Sept. 30, 2014) ("Although Citigroup disclaims any effort to turn this proceeding into a trial on the merits of Plaintiffs possible derivative claims, Citigroup essentially seeks that result by implying that Plaintiff must have specific, tangible evidence that Citigroup's Board or senior management was complicit in the fraud at Banamex. That argument ignores the inferences that this Court can—and must—draw under the credible basis standard, and would discourage the very behavior this Court has sought to encourage among would-be derivative or class plaintiffs."); *LAMPERS*, 2007 WL 2896540, at *12 (rejecting, in a Section 220 proceeding, that no springloading ever occurred because "by raising such a defense, Countrywide seeks to litigate the ultimate issue in a possible future derivative suit that might eventually be filed by LAMPERS. This is neither the time nor the procedural setting to address that issue.").

[96]  *Freund v. Lucent Techs.*, 2003 WL 139766, at *4 (Del. Ch. 2003) (emphasis added).

21

**B.** **Plaintiffs are Entitled to Some, But Not All, of the Books and Records They Seek**

Finding Plaintiffs are entitled to books and records, I turn to the scope of inspection. Plaintiffs seek the following documents from 2005 to the present: (1) board and committee meeting documents; (2) meeting preparation materials; (3) company policy and procedures; (4) internal investigation materials; (5) board materials concerning director disinterestedness and independence; (6) copies of documents referenced in the *Qui Tam* Action;[97] and (7) communications of five senior-level officers.[98] Within each category, Plaintiffs demand documents related to the following topics: (1) "Defendant's filing of, or failure to fix previously submitted, false claims to [Medicare] seeking risk adjustment payments;" (2) "Defendant's initiatives to increase revenues through risk adjustment submissions;" (3) "Defendant's initiatives to identify erroneous risk adjustments;" and (4)

---

[97]  In addition to the corporate records referenced in the civil actions, in their opening brief, Plaintiffs also request the records that "UnitedHealth has provided to the government and any other stockholders who have made Section 220 requests." Pls.' Opening Br. 39. Plaintiffs appear to have abandoned their request for all of the records that UnitedHealth has provided to the government in their reply brief. Pls.' Reply Br. 11–12. But, if I have misread Plaintiffs' position, the request is denied. As to the request for documents related to other UnitedHealth stockholders who have made Section 220 requests, Defendant represented there are none. Def.'s Answering Br. 41.

[98]  Tr. 34; PX 1 at 1; PX 2 at 22; PX 3 at 22; PX 18 at 15–18. At trial, Plaintiffs limited the temporal scope for communications to 2010 to the present. Tr. 55–56.

"Defendant's compliance, or lack thereof, with any regulations or laws relating to detecting or preventing the filing of, or failing to fix previously submitted, false claims to [Medicare] seeking risk adjustment payments."[99]

The stockholder may only inspect what is "necessary and essential to accomplish the stated, proper purpose."[100] "Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[101] "[T]he burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose."[102] The Court of Chancery must "tailor the inspection to the stockholder's stated purpose."[103] "[W]here a [Section] 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the

---

[99]     PTO ¶ 2.

[100]    *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002).

[101]    *Wal–Mart*, 95 A.3d at 1271 (quoting *Espinoza v. Hewlett–Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011)).

[102]    *Thomas & Betts*, 681 A.2d at 1035.

[103]    *Yahoo! Inc.*, 132 A.3d at 787 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del. 1997)).

stockholder should be given enough information to effectively address the problem."[104]

First, at trial, Defendant did not dispute Plaintiffs' entitlement to written materials for board and committee meetings of the Company and its subsidiaries, WellMed and Ingenix.[105] Written materials may include minutes, notices, agendas, exhibits, board books, reports, and presentations. Written materials do not include draft minutes. Plaintiffs' request to inspect the written materials produced for board and committee meetings is granted.

Second, Plaintiffs have shown meeting preparation materials are necessary for the purpose of their inspection. This includes memoranda, outlines, scripts, notes, and talking points used for board or committee meetings. Plaintiffs, however, seek preparation materials over a twelve-year period.[106] Given the vast time period, Defendant makes a reasonable request that Plaintiffs identify meetings from which Plaintiffs request preparation materials.[107] While Plaintiffs are entitled to preparation materials, they are limited by Defendant's request.

---

[104] *Saito*, 806 A.2d at 115.

[105] Tr. 99.

[106] Pls.' Opening Br. 50.

[107] Tr. 102.

24

Third, at trial, Defendant conceded policies and procedures are appropriate books and records for Plaintiffs' stated purpose.[108] Thus, they are granted.

Fourth, Defendant represented at trial that the board has not conducted any internal investigation related to this matter.[109] Thus, this request is denied.

Fifth, for documents relating to director disinterestedness and independence, Plaintiffs request books and records used in the director nomination process as well as disclosure and questionnaire files. At trial, Defendant agreed that both requests are appropriate in a Section 220 action.[110] Therefore, Plaintiffs are entitled to such documents.

Sixth, while Defendant argued at trial that Plaintiffs' request for documents referenced in the Poehling Complaint and the DOJ Complaint was "wholly unmanageable," it recommended that Plaintiffs provide a list detailing which documents Plaintiffs seek from the complaints.[111] Plaintiffs agreed to produce this

---

[108]    Tr. 105:20–24 ("Policies and procedures, yes, they exist. They exist with respect to officer attestations, chart review programs. If Your Honor would rule in their favor, that level of policy and procedure would be appropriate.").

[109]    *Id.* at 106.

[110]    *Id.* at 107–08.

[111]    *Id.* at 113–14.

25

list.[112]  Therefore, I grant the request with the parameters the parties negotiated during trial.

Seventh, and finally, Plaintiffs request officer communications, including emails, with respect to the alleged misconduct identified in the demands.  Unlike the production of other books and records, email communications are generally "the exception rather than the rule."[113]  "Unlike in plenary discovery, where the responding party bears the burden of limiting its scope, the burden in a Section 220 proceeding is on the party seeking production. Moreover, the court must tailor the production order to balance the interests of the stockholder and the corporation."[114] While Plaintiffs narrowed the scope of this request to (1) five senior-level officers, (2) documents that have already been collected from the *Qui Tam* Action, and (3) an eight-year period rather than a twelve-year period,[115] they have not established that the email communications are necessary for their proper purpose.  Plaintiffs rely primarily on *Wal–Mart Stores, Inc. v. Indiana Electric Workers Pension Trust Fund*

---

[112]  *Id.* at 131–32.

[113]  PX 22 at 109; *Citigroup Inc.*, 2014 WL 5351345, Tr. at 109; *see Yahoo! Inc.*, 132 A.3d at 790 ("The starting point—and often the ending point—for a sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered.").

[114]  *Yahoo! Inc.*, 132 A.3d at 789 (citation omitted).

[115]  Tr. 44, 55–56.

*IBEW* and *Amalgamated Bank v. Yahoo! Inc.* as support for their demand to inspect emails.[116] But this case is distinguishable from both *Wal–Mart* and *Yahoo!*. In both *Wal–Mart* and *Yahoo!*, the plaintiffs were granted officer-level communications because the plaintiffs carried their burden of showing why board-level documents alone would not be sufficient for their stated purposes.[117] Here, Plaintiffs have not done so. Evidence does not suggest that the board was unaware of the upcoding scheme. In fact, Plaintiffs are alleging that members of the Company's board deliberately took steps to further the fraudulent scheme.[118]

Furthermore, given the amount of information Plaintiffs are receiving, they have not shown why additional communications of five custodians across an eight-year span is necessary for their investigation. In particular, Plaintiffs will receive all of the written materials for board and committee meetings, meeting preparation materials that they identify, policies and procedures, and disclosure and questionnaire files related to director disinterestedness and independence. Additionally, Plaintiffs will receive all of the documents referenced in the Poehling Complaint and the DOJ Complaint, which include email communications. They

---

[116]    Pls.' Opening Br. 43 n.133–34, 44 n.138.

[117]    *Wal–Mart*, 95 A.3d at 1272–73; *Yahoo! Inc.*, 132 A.3d at 792.

[118]    Pls.' Opening Br. 1–2.

27

have not met their burden of showing that additional email communications from these particular officers are necessary to their investigation.

At trial, Defendant conceded that the twelve-year date range "would be appropriate in light of the length -- the long period of time covered by the allegations in the complaint."[119] Therefore, of the books and records granted above, Plaintiffs are entitled to documents from 2005 to the present.

Defendant requests that any production be subject to a reasonable confidentiality order and incorporated by reference into any future derivative complaint.[120] Plaintiffs did not contest this in their briefing or at trial. This request is granted.

## III.   CONCLUSION

For the aforementioned reasons, I grant Plaintiffs demand to inspect the books and records detailed above subject to the incorporation-by-reference doctrine and confidentiality order. Parties shall submit a conforming order within ten days.

**IT IS SO ORDERED**.

---

[119]   Tr. 109.

[120]   Def.'s Answering Br. 44.

28