# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LOREN TRENT HIGHTOWER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0720-KSJM |
| | ) | |
| SHARPSPRING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: May 24, 2022
Date Decided: August 31, 2022

Blake A. Bennett, COOCH & TAYLOR, P.A., Wilmington, Delaware; Michael J. Palestina, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana; *Counsel for Plaintiff Loren Trent Hightower*.

Matthew E. Fischer, POTTER ANDERSON & CORROON LLP*,* Wilmington, Delaware; John L. Kirtley, Charles A. Gordon, Emma J. Jewell, GODFREY & KAHN, S.C., Milwaukee, Wisconsin; *Counsel for Defendant SharpSpring, Inc.*

**McCORMICK, C.**

In June 2021, SharpSpring, Inc. ("SharpSpring" or the "Company") announced that it had entered into a merger agreement to be acquired by Constant Contact, Inc. ("CCI"). The plaintiff, who owned stock in SharpSpring at the time, sent a demand pursuant to 8 *Del. C.* § 220 to inspect SharpSpring's books and records for the purpose of investigating possible wrongdoing in connection with the merger. As a credible basis for investigating wrongdoing, the plaintiff expressed concern that the transaction was tainted by conflicts on the part of the Chief Executive Officer who negotiated the transaction. In response to the plaintiff's demand, SharpSpring produced some formal board materials concerning meetings leading up to the merger agreement but declined to produce other documents requested by the plaintiff. The plaintiff filed this enforcement action. At trial, the plaintiff demonstrated that the board minutes' descriptions of key events did not match up with the proxy's descriptions of those events in important ways. This post-trial decision grants the plaintiff limited inspection of books and records concerning those key events.

## I.      FACTUAL BACKGROUND

The court held trial on a paper record on May 24, 2022. The record comprises 23 trial exhibits. These are the facts as the court finds them after trial.[1]

---

[1] The Factual Background cites to: C.A. No. 2021-0720-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); and the trial transcript (Dkt. 34) ("Trial Tr.").

## A. SharpSpring Commences A Sale Process.

SharpSpring is a cloud-based marketing technology company incorporated under Delaware law.[2] Shares of SharpSpring common stock were traded on the NASDAQ Capital Market under the symbol "SHSP."[3]

In June 2020, a third party expressed interest in making a minority investment in SharpSpring. SharpSpring's Board of Directors (the "Board") declined the offer, but the offer kicked off Board discussions concerning strategic alternatives. In December 2020, SharpSpring hired JMP Securities, LLC ("JMP") to advise on a potential transaction or transactions.[4] Initially, the Board was open to the possibility of SharpSpring acquiring a third party.[5] By the end of January 2021, however, the Board had determined to focus instead on a potential sale of SharpSpring.[6]

In the months that followed, JMP contacted 80 potential acquirers.[7] Fourteen signed a non-disclosure agreement.[8] Seven subsequently indicated they were not interested or became unresponsive.[9] By April 2021, only one party remained actively engaged: CCI, an

---

[2] JX-1 (Compl.) ¶ 10; JX-2 (Answer) ¶ 10.

[3] JX-5 (Proxy) at 39.

[4] *Id.* at 44.

[5] *Id.*

[6] *Id.*

[7] *Id.* at 45.

[8] *Id.*

[9] *Id.*

online marketing company incorporated under Delaware law.[10] JMP's representatives requested that CCI submit an indication of interest.[11]

## B. The Indication Of Interest

On May 4, 2021, CCI submitted an indication of interest to acquire SharpSpring for a price between $17.00 and $19.00 per share.[12] That same day, the Board met to discuss the indication of interest and instructed SharpSpring's Chief Executive Officer, Richard Carlson, to proceed with CCI to find a revised per-share price "ideally in the direction of at least $20.00 per share."[13]

Carlson discussed a price range with CCI's Chief Executive Officer, Frank Vella, on May 6, 2021.[14] CCI responded five days later that it was not willing to pursue the transaction at a price exceeding $19.00 per share and that CCI intended to provide a letter of intent by June 1, 2021.[15]

## C. The Transaction Bonus Pool

To prepare its letter of intent, CCI asked JMP to provide an estimate of transaction-related costs that SharpSpring would incur in connection with a merger transaction, including a transaction bonus pool intended to induce Carlson and other SharpSpring

---

[10] *Id.* at 46, 11, 39.

[11] *Id.* at 46.

[12] *Id.* at 47.

[13] JX-13 (May 4, 2021 Board meeting minutes) at 2.

[14] JX-5 (Proxy) at 47.

[15] *Id.* at 48.

employees to remain with the Company through the completion of the transaction.[16]  On May 30, 2021, JMP, Board Chair Steven Huey,[17] Company director Scott Miller,[18] and the Company's outside legal counsel met telephonically to discuss a transaction bonus pool.[19] Carlson did not participate in the May 30 meeting.[20]

After the meeting, Huey and Miller expressed support for a transaction bonus pool in the aggregate amount of $1.5 million.[21]  Of this amount, $1.0 million would be payable to Carlson.[22]

### D. The Letter Of Intent

On June 2, 2021, CCI transmitted a non-binding letter of intent with a proposal to acquire SharpSpring for $17.00 per share.[23]  The proposal assumed that transaction-related expenses would not exceed $10.0 million, which included the bonus pool.[24]  The Board met to discuss the proposal the same day.[25]  The Board concluded that the proposal was within an acceptable range for entering into exclusivity, and that in light of challenges,

---

[16] *Id.*

[17] JX-1 (Compl.) ¶ 5.

[18] JX-5 (Proxy) at 14.

[19] *Id.* at 49.

[20] *See id.* (excluding Carlson from a list of parties to the call on May 30, 2021).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

4

including those relating to recurring revenue, SharpSpring should continue to pursue the transaction.[26]

### E. The Revised Proposal, Increased Offer, And Updated Financials

After the Board determined to pursue a transaction with CCI at the June 2 meeting, the Board went into executive session.[27] During executive session, the Board determined to seek JMP's advice on risks associated with making a revised proposal (the "Revised Proposal") that CCI increase its offer to $17.25 per share and the bonus pool to $3 million.[28] The Board determined that if JMP advised that the risk was modest, they would authorize Carlson and JMP to make the Revised Proposal to CCI.[29]

After the June 2 meeting, JMP advised that making the Revised Proposal would not present a material risk that CCI would terminate negotiations.[30] Accordingly, the Board authorized Carlson and JMP to make the Revised Proposal to CCI.[31] In response to communications from Carlson and JMP, CCI offered a price of $17.10 per share and agreed to the increased bonus pool.[32] The Board met again on June 4, 2021, for an update and to discuss the counteroffer.[33]

---

[26] *Id.* at 49–50.

[27] *Id.* at 50.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

After the Board received news of CCI's offer of $17.10 at the June 4, 2021 meeting, SharpSpring lowered it 2021 projections.[34]

## F.    The Merger Agreement

On June 21, 2021, the Board approved a transaction at a price of $17.10 per share and SharpSpring publicly announced the deal.[35]  On July 14, 2021, SharpSpring filed a preliminary Schedule 14A Proxy Statement with the U.S. Securities and Exchange Commission, and on July 30, 2021, the Company filed a definitive Schedule 14A Proxy Statement (the "Proxy") with the SEC soliciting stockholder approval of the Proposed Transaction.[36]  The merger closed on September 1, 2021.[37]

## G.    Discrepancies Between The Board Minutes And The Proxy

Athough the Proxy and minutes of the June 2 and June 4, 2021 Board meetings each recount the events between June 2 and June 4, they reflect different accounts of key facts.

### 1.    Whose idea was the Revised Proposal?

According to the minutes, before the Board entered executive session during the June 2, 2021 meeting, Carlson proposed that he direct JMP to go back to CCI with a demand to increase the per-share price to $17.25 and the bonus pool to $3.0 million.[38]

---

[34] *Id.* at 50–51 ("The Board concluded [at its June 4 meeting] that, based on the factors discussed at previous meetings, the January 2021 Budget did not accurately reflect the likely performance of the Company in the future and accordingly instructed management to update the 2021 projections to be consistent with management's and the Board's expected performance of the business.").

[35] *Id.* at 2–3.

[36] JX-1 (Compl.) ¶ 2.

[37] JX-7 (Sept. 1, 2021 Form 8-K) at 3.

[38] JX-15 (June 2, 2021 Board meeting minutes) at 2.

After further discussion, "several Board members noted the potential risk of reverting to [CCI] with these additional requests[.]"[39] Presumably out of the concern that an increased bonus pool might decrease merger consideration, the Board "expressed a desire to discuss the two requests separately, rather than conflate the request relating to merger consideration with the transaction bonus pool request."[40]

By contrast, the Proxy does not mention that Carlson himself proposed the increased per-share price and bonus pool. Nor does the Proxy mention that the independent Board members expressed concern about the proposal. The Proxy states only that the independent directors discussed the terms that would become the Revised Proposal in executive session.[41]

### 2. Did anyone convey the Revised Proposal to CCI?

According to the minutes, neither Carlson nor JMP ever conveyed a key term of the Revised Proposal, namely that CCI increase its offer price to $17.25 per share. Rather, the minutes reflect that JMP mistakenly asked that CCI increase its offer to a mere $17.10, and then the Board determined not to correct the mistake based on Carlson's recommendation.[42] The minutes state:

> Based on instructions from Mr. Huey following the June 2, 2021 Board meeting, Mr. Carlson had discussed with JMP the

---

[39] *Id.*

[40] *Id.*

[41] JX-5 (Proxy) at 50 ("The independent members of the Board continued the discussion at the June 2, 2021 meeting in executive session without Mr. Carlson or other members of management, and discussed seeking to have [CCI] increase the proposed merger consideration to $17.25 per share.").

[42] JX-16 (June 4, 2021 Board meeting minutes) at 1.

proposal to request that [CCI] increase the merger consideration to $17.25 per share and, as a separate and distinct request, to agree to a transaction bonus pool of $3.0 million. After a series of discussions among Mr. Carlson and JMP regarding the proposed request, JMP confirmed to Mr. Carlson and the Board its intention to request that [CCI] increase the purchase price by approximately $1.5 million, and to adjust assumed transaction expenses to include an incremental $1.5 million of transaction bonuses for Company employees, stating its view that such request would not materially put the overall transaction at risk. With the affirmation of the Board, JMP proceeded with the request. Mr. Carlson noted that, based on a misunderstanding on the part of JMP, JMP proceeded to request an increase in the merger consideration to $17.10 per share, rather that the higher amounts previously discussed. Based on his understanding that [CCI] had already discussed and received approval to increase the price to $17.10 per share Mr. Carlson believed that going back again to request an increase to $17.25 would potentially jeopardize the willingness of [CCI] to proceed, so he declined to do so. JMP received the Revised Proposal later in the day. A discussion followed during which the independent members of the Board concurred with Mr. Carlson's conclusion not to make an additional request.[43]

The Proxy does not say that JMP mistakenly demanded $17.10 instead of $17.25.

The Proxy instead says that JMP made the $17.25 demand after CCI offered $17.10:

Representatives of [JMP] communicated a request to representatives of [CCI] to increase the per share merger consideration. Separately, representatives of [JMP] informed [CCI] of the Company's intention with respect to the aggregate amount of the transaction bonus pool. Following additional communications among Mr. Carlson, representatives of [JMP], Mr. Vella and other representatives of [CCI], on the evening of June 3, 2021, [CCI] agreed to increase the proposed price per share to $17.10. Representatives of [JMP] subsequently requested from representatives of [CCI] an additional increase

[43] *Id.*

in the price per share to $17.25, but representatives of [CCI] declined to further increase the price.[44]

### 3. Why were the projections lowered?

Concerning the 2021 projections, the minutes of the June 4, 2021 meeting state only that Carlson "fielded a number of questions from the Board regarding the status of the projections being used by JMP."[45] The minutes say nothing about the Board instructing management to update the projections or the reasons for doing so.

By contrast, the Proxy says that, during the June 4 Board meeting, the Board made a determination that "the January 2021 budget did not accurately reflect the likely performance of the Company in the future and accordingly instructed management to update the 2021 projections to be consistent with management's and the Board's expected performance of the business."[46]

### H. Buckel's Resignation

When the sale process began, the Board comprised Carlson, Huey, and Miller, as well as David Buckel and Savneet Singh.[47] Jason Costi joined the Board partway through the process in April 2021.[48]

---

[44] JX-5 (Proxy) at 50.

[45] JX-16 (June 4, 2021 Board meeting minutes) at 2.

[46] JX-5 (Proxy) at 50–51.

[47] JX-19 (July 14, 2020 Form 8-K) at 2; JX-20 (Aug. 19, 2020 Form 8-K) at 2.

[48] JX-3 (Apr. 21, 2021 Form 8-K) at 2.

On April 15, 2021, Buckel informed the Board that he would not stand for reelection at SharpSpring's 2021 annual stockholder meeting on June 17, 2021.[49]  In a June 22, 2021 Form 8-K filed with the SEC, SharpSpring represented that Buckel's choice was "not a result of any disagreement between himself and the Company, its management, the Board or any committee of the Board."[50]

## I.     Plaintiff Demands Books And Records.

On August 3, 2021, counsel for Plaintiff Loren Trent Hightower ("Plaintiff") sent a demand letter to SharpSpring pursuant to 8 *Del. C.* § 220.[51]  Plaintiff identified many purposes for inspection in his demand letter, but they are all primarily within the category of investigating possible wrongdoing in connection with the merger.[52]

SharpSpring responded on August 10, 2021.[53]  SharpSpring articulated its position that Plaintiff was not entitled to inspect the records requested based on deficiencies with

---

[49] *Id.*

[50]  *Id.*

[51] JX-2 (Answer) ¶¶ 5–6.

[52] JX-1 (Compl.) ¶ 1.  Plaintiff's stated purposes were to: investigate the events leading to the Merger Agreement; investigate the independence and disinterestedness of certain members of SharpSpring's management and the Board in connection with the Merger Agreement and Proposed Transaction; investigate the completeness of SharpSpring's disclosures regarding the Merger Agreement and Proposed Transaction; determine whether wrongdoing, mismanagement, and/or material non-disclosure took place such that it would be appropriate to file a breach of fiduciary duty action against certain members of the Board and/or management who may have breached their fiduciary duties in connection with the Proposed Transaction; and consider any other courses of action that the investigation might warrant pursuing. Plaintiff also stated in the demand that one of his purposes was to value his shares, but he abandoned that purpose by the time of trial.  *Compare* JX-1 (Compl.) ¶ 1 *with* Dkt. 14 ("Pl.'s Opening Br.") at 1.

[53] JX-2 (Answer) ¶¶ 6–7.

his demand but offered, subject to executing a confidentiality agreement, to provide the Board minutes Plaintiff requested.[54] The parties met and conferred, shortly after which they entered into a confidentiality agreement governing the treatment of documents SharpSpring would provide Plaintiff.[55] On August 22, 2021, SharpSpring provided Plaintiff with all minutes of meetings of the Board held between July 1, 2020 and June 22, 2021, which was the period that Plaintiff requested.[56]

Delaware law requires that a stockholder own stock at the time of filing its enforcement action.[57] In light of the August 24, 2021 vote on the merger, Plaintiff filed this action to preserve his ability to enforce inspection rights if necessary.[58] The parties then continued discussions regarding a supplemental production, but they were ultimately unable to agree on the issue of scope.[59]

The parties stipulated to go to trial on a paper record.[60] In its pre-trial brief, Defendant relied on a declaration dated February 3, 2022, from James Pade, a partner with CCI's financial sponsor, Clearlake Capital Group, L.P. Pade attested that he was

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *See* 8 *Del. C.* § 220(c)(1); *Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *3–5 (Del. Ch. Feb. 27, 2017) (holding that a stockholder who makes a pre-closing demand and files a Section 220 enforcement action before the merger closes and eliminates his stockholder status has standing to pursue a Section 220 enforcement action).

[58] Dkt. 1 (Compl.).

[59] Dkt. 6 (Status Rep.).

[60] Dkt. 7 (Parties' Stipulation).

11

personally involved in the negotiations for the acquisition of SharpSpring.[61] Defendant had provided this declaration to Plaintiff in February 2022, but the declaration was not included in the paper record to which the parties had stipulated. Plaintiff moved to strike the declaration and Defendant's pre-trial brief for that reason.[62] In response, Defendant agreed to withdraw the Pade declaration and refiled its pretrial brief.[63] Because the declaration has been withdrawn, this memorandum opinion does not consider it.[64]

## II.    LEGAL ANALYSIS

Under 8 *Del. C.* § 220, a stockholder is entitled to inspect a company's books and records if he demonstrates by a preponderance of the evidence that he "is a stockholder of the company," "has made a written demand on the company" compliant with the form and manner requirements of 8 *Del. C.* § 220, and "has a proper purpose for making the demand."[65] If a stockholder meets these requirements, the stockholder must then establish "that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose."[66]

---

[61] Dkt. 17 (Declaration of James Pade).

[62] Dkt. 20 (Mot. to Strike).

[63] Dkt. 22 (Ltr. from Def. re: Mot. to Strike); Dkt. 26 ("Def.'s Revised Answering Br.").

[64] Although this decision need not address the parties' dispute concerning the Pade declaration, I feel compelled to note that a stockholder seeking to inspect books and records under Section 220 should not have to accept a lawyer-crafted, litigation-style declaration as a substitute for corporate records that are necessary and essential to his stated purpose. By noting this, I do not mean to suggest that Defendant in this case took that position; rather, I seek to stave off other defendants from thinking that the declaration approach might be a good idea.

[65] *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *3 (Del. Ch. Jan. 5, 2012).

[66] *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1035 (Del. 1996).

The parties have stipulated to Plaintiff's standing as a stockholder and that his written demand complies with the form and manner requirements of 8 *Del. C.* § 220.[67] The parties dispute whether Plaintiff has established all of the elements of a proper purpose and, if so, whether the documents he seeks are essential to that purpose.[68]

## A.     Proper Purpose

Plaintiff seeks to investigate possible wrongdoing in connection with the merger. This is a proper purpose under Delaware law.[69]  Where a plaintiff seeks to investigate possible wrongdoing, however, a mere statement of that purpose without more will not entitle him to inspection.[70]  To inspect documents for the purpose of investigating mismanagement or wrongdoing, the plaintiff "must present some evidence to suggest a credible basis from which a court can infer that mismanagement . . . or wrongdoing may have occurred."[71]

---

[67] Dkt. 31 (Stipulation Concerning Joint Ex. List for Trial) at 1.

[68] Pl.'s Opening Br. at 4; Def's Revised Answering Br. at 28.

[69] *See, e.g.*, *KT4 P'rs v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019) ("One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management.  When a stockholder has made a colorable showing of potential wrongdoing, inspecting the company's books and records can help the stockholder to ferret out whether that wrongdoing is real and then possibly file a lawsuit if appropriate."); *Wei v. Zoox, Inc.*, 268 A.3d 1207, 1218 n.51 (Del. Ch. Jan. 31, 2022) (collecting cases supporting the proposition that investigating possible wrongdoing in connection with a merger is a proper purpose for inspection under 8 *Del. C.* § 220).

[70] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006) (quoting *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del. Ch. 1987)).

[71] *Id.* at 118 (quotation marks omitted).

The credible basis standard imposes "the lowest possible burden of proof."[72] It does not require a stockholder to prove that wrongdoing "actually occurred."[73] Nor does it require a stockholder "to show by a preponderance of the evidence that wrongdoing is probable."[74] Any such requirement "would completely undermine the purpose of Section 220 proceedings, which is to provide shareholders the access needed to make that determination in the first instance."[75] Rather, a stockholder need only establish by a preponderance of the evidence that there is a credible basis to suspect a *possibility* of wrongdoing.[76]

In determining whether a plaintiff has presented a credible basis for inspection, the court looks at the allegations collectively.[77] The "threshold may be satisfied by a credible

---

[72] *Id.* at 123.

[73] *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *accord. Thomas & Betts*, 681 A.2d at 1031 ("While stockholders have the burden of coming forward with specific and credible allegations sufficient to warrant a suspicion of waste and mismanagement, they are not required to prove by a preponderance of the evidence that waste and mismanagement are actually occurring.").

[74] *Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *8 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020) [hereinafter *AmerisourceBergen*].

[75] *La. Mun. Police Emps.' Ret. Sys. v. Countrywide Fin. Corp.*, 2007 WL 2896540, at *12 (Del. Ch. Oct. 2, 2007 ), *order clarified*, 2007 WL 4373116 (Del. Ch. Dec. 6, 2007) [hereinafter *Countrywide*].

[76] *See AmerisourceBergen*, 2020 WL 132752, at *8–9; *see also Seinfeld*, 909 A.2d at 118 (holding that a plaintiff in an action under 8 *Del. C.* § 220 need only allege a "'credible basis' from which a court can infer that mismanagement, waste or wrongdoing *may* have occurred" (emphasis added) (internal ref's omitted)).

[77] *See, e.g.*, *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *11–14 (Del. Ch. Apr. 30, 2015) (collectively assessing a company founder's inside knowledge based on company emails, suspicious timing and magnitude of founder's trades, and the speed at which founder hit his monthly trading cap); *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *4 (determining that plaintiff had identified a credible basis for demand

showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[78] When evaluating whether a credible basis exists, the court may consider ongoing lawsuits, investigations, circumstantial evidence, and even hearsay statements evincing possible wrongdoing.[79]

In this case, Plaintiff argues that there is a credible basis to suspect that the merger was the result of a conflicted sale process through which directors and officers breached their fiduciary duties to SharpSpring's stockholders. Plaintiff alleges that Carlson was conflicted with respect to the transaction because he had an incentive to secure larger transaction bonuses for himself and his fellow executives. Despite this conflict, Carlson was allowed to negotiate the bonus pool hand-in-hand with the merger consideration. After CCI agreed to the increased bonus pool, according to the Board minutes, Carlson recommended that the Board not request the $17.25 per-share price, and the Board

under 8 *Del. C.* § 220 based on evidence which included "numerous third-party media reports," "the noisy resignations of three board members" and a publicly announced "internal investigation").

[78] *Seinfeld*, 909 A.2d at 123 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

[79] *See, e.g.*, *AmerisourceBergen*, 2020 WL 132752, at *9 ("Ongoing investigations and lawsuits can provide the necessary evidentiary basis to suspect wrongdoing or mismanagement warranting further investigation. This type of evidence is strong when governmental agencies or arms of law enforcement have conducted the investigations or pursued the lawsuits."); *Countrywide*, 2007 WL 2896540, at *10–12 (finding a news article and independent statistical analysis of stock option grant dates sufficient to suspect options backdating); *Elow v. Express Scripts Hldgs. Co.*, 2017 WL 2352151, at *5–6 (Del. Ch. May 31, 2017) (finding "pleadings in the Anthem Action, the Securities Action complaints, and public statements by Express Scripts" sufficient to establish a credible basis), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019); *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 792 (Del. Ch. 2000) (finding an "SEC inquiry" and "SEC Order" were "sufficiently concrete" to suspect mismanagement).

concurred.[80]  The Company then lowered the 2021 projections, which had the effect of making the merger consideration look more attractive.[81]  And the Company's disclosures do not align with the minutes in important respects as to key events in the negotiations.[82]

Considered collectively, these allegations provide a credible basis to suspect possible wrongdoing in connection with the merger.  There is a credible basis to infer that Carlson's conflicts led the Board not to demand a higher per-share price, that the Board later adjusted the Company's projections to justify a lower offer, and that the Company presented an inaccurate and misleading narrative in the Proxy to cover it up.  Lesser showings relating to fiduciary conflicts and surrounding conduct have been found sufficient to establish a credible basis to support an action under 8 *Del. C.* § 220.[83]

Although it might be the case that none of Plaintiff's concerns are founded, Plaintiff has established enough to investigate them.

Plaintiff also points to Buckel's resignation as supporting a credible basis, theorizing that Buckel may have resigned over a dispute regarding the progression of the sale process.  Buckel's announcement, however, is of no moment in the court's eyes.  Sales

---

[80] *Id.*

[81] *Id.* at 3.

[82] *Id.* at 2–4.

[83] *See, e.g.*, *Lavin v. West Corp.*, 2017 WL 6728702, at *7–10 (Del. Ch. Dec. 29, 2017) (finding a credible basis where a plaintiff presented evidence from a proxy statement indicating that the directors and officers of the defendant corporation would receive various financial incentives as a result of a prospective merger—including "golden parachute" awards, stock options, and cash payments—but the same directors and officers would not receive these incentive payments if the company's segments were sold instead).

16

processes happen all the time and can demand much from a director. Were this court to conclude that a director's decision not to stand for reelection during the course of a sale process was enough on its own to supply a credible basis to suspect possible wrongdoing in connection with that sale process, such a ruling might inadvertently pressure directors to remain on boards longer than they desire. Delaware wants engaged directors, not reluctant ones. Standing alone, Buckel's stated intent not to stand for reelection does not supply a credible basis of possible wrongdoing.

## B. Scope Of Production

Once a Section 220 plaintiff establishes a proper purpose, the court must determine the scope of inspection. The scope of inspection is a fact-specific inquiry, and the court has broad discretion when conducting it.[84]

"When tailoring the production order, the court must balance the interests of the stockholder and the corporation."[85] Delaware law strikes this balance by limiting a stockholder-plaintiff's inspection to those records "essential and sufficient" to his stated purpose and by placing the burden of proof on the stockholder.[86] The Delaware Supreme Court has articulated this burden as follows:

> Books and records satisfy this standard "if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'" That determination is "fact

---

[84] *NVIDIA Corp. v. City of Westland Police and Fire Ret. Sys.*, --- A.3d ---, 2022 WL 2812718, at *17 (Del. July 19, 2022) (addressing both the fact-specific nature of the scope-of-inspection inquiry and stating that a Chancery court order is only reversible on appeal if it amounts to an abuse of discretion).

[85] *AmerisourceBergen*, 2020 WL 132752, at *24 (citing *Sec. First Corp.*, 687 A.2d at 569).

[86] *KT4 P'rs*, 203 A.3d at 751–52.

17

> specific and will necessarily depend on the context in which the shareholder's inspection demand arises." Keeping in mind that § 220 inspections are not tantamount to "comprehensive discovery," the Court of Chancery must tailor its order for inspection to cover only those books and records that are "essential and sufficient to the stockholder's stated purpose." In other words, the court must give the petitioner everything that is "essential," but stop at what is "sufficient."[87]

Framed slightly differently, the essential-and-sufficient standard requires that, "where a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders."[88]

Where the stockholder's stated purpose is to inspect possible wrongdoing, the scope analysis has multiple dimensions. As an initial matter, the court must consider the nature of the alleged wrongdoing that the stockholder seeks to investigate, *i.e.*, the who, what, where, when, and why of the possible wrongdoing. "When 'a plaintiff has shown evidence of wide-ranging mismanagement or waste, a more wide-ranging inspection may be justified.'"[89] By contrast, when the allegations of possible wrongdoing target a single transaction or sale process, then a targeted scope of inspection will likely follow.

---

[87] *Id.* at 751–52 (citations and footnotes omitted).

[88] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002).

[89] *AmerisourceBergen*, 2020 WL 132752 at *24 (quoting *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at *5 (Del. Ch. Jan. 9, 2003) and citing *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 211 (Del. Ch. Dec. 3, 1976)).

The court must also consider a separate but related question of what types of documents are likely to provide the necessary information.  On this topic, Vice Chancellor Laster created a helpful taxonomy to aid the court when analyzing the question of scope, classifying corporate books and records into three categories:

- "Formal Board Materials," which are "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered;"[90]

- "Informal Board Materials,"[91] which "generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings" and sometimes including "emails and other types of communication sent among the directors themselves, even if the directors used non-corporate accounts;"[92] and

- "Officer-Level Materials," which are "communications and materials that were only shared among or reviewed by officers and employees."[93]

Of these categories, this court encourages corporations to produce Formal Board Materials in response to meritorious demands for inspection without forcing stockholders to litigate over them.[94]  Formal Board Materials are typically easy to gather and produce. "In many organizations, the corporate secretary maintains a central file for each board meeting in either paper or electronic form that contained the minutes and other Formal

---

[90] *AmerisourceBergen*, 2020 WL 132752, at *24 (collecting cases limiting the scope of production to Formal Board Material); *see also Woods v. Sahara Enters.*, 2020 WL 4200131, at *11 (Del. Ch. July 22, 2020) (same).

[91] *AmerisourceBergen*, 2020 WL 132752, at *25.

[92] *Id.* (collecting cases ordering inspection of Informal Board Materials).

[93] *Id.* (collecting cases ordering inspection of Officer-Level Materials).

[94] *Pettry v. Gilead Sciences, Inc.*, 2020 WL 6870461, at *24 (Del. Ch. Nov. 24, 2020).

Board Materials for that meeting."[95] Where Formal Board Materials include contemporaneously prepared, long-form minutes, they are often sufficient to sate a stockholders' needs. For this reason, "[t]he starting point (and often the ending point) for an adequate inspection will be [Formal Board Materials]."[96] "The principle is that the Court of Chancery should not order emails to be produced when other materials (*e.g.*, traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose."[97]

Of course, even when a stockholder has received Formal Board Materials, a stockholder may demonstrate a need for a broader inspection into Informal Board Materials and Officer-Level Materials.[98] Any number of scenarios might lead to broader inspection; the scope analysis is highly fact-dependent. For example, a stockholder might demonstrate that the alleged wrongdoing happened exclusively or predominantly at the officer level,

---

[95] *AmerisourceBergen*, 2020 WL 132752 at *24.

[96] *Id.*

[97] *KT4 P'rs*, 203 A.3d at 752–53.

[98] *Id.* at 753 ("[I]f non-email books and records are insufficient, then the court should order emails to be produced."); *AmerisourceBergen*, 2020 WL 132752, at *25 ("If the plaintiff makes a proper showing, an inspection may extend to informal materials that evidence the directors' deliberations, the information that they received, and the decisions they reached . . . . In an appropriate case, an inspection may extend further to encompass communications and materials that were only shared among or reviewed by officers and employees.").

such that Formal Board Materials would not shed light on the relevant events,[99] or that the Formal Board Materials fail to provide details as to key events.[100]

In this case, Plaintiff has demonstrated a need for documents beyond the Formal Board Materials. Prior to litigation, the Company produced all Board minutes for the time period requested by Plaintiff, which is to the Company's credit. It is unclear to what degree the Company produced all Formal Board Materials. To the extent other Formal Board Materials exist but have not been produced to Plaintiff, the Company should produce them.

After receiving the Board minutes, Plaintiff compared them against the Proxy, revealing inconsistent accounts of the events of June 2 through June 4, 2021, discussed above. Those inconsistencies provided Plaintiff the foothold to argue for a broader inspection. To reconcile those inconsistencies, Plaintiff requires more information. And Plaintiff has demonstrated that he needs Informal Board Materials and Officer-Level Materials as to three categories of documents.

First, Plaintiff is entitled to Informal Board Materials and Officer-Level Materials concerning the genesis of the Revised Proposal. The Company shall confer with Plaintiff

[99] *See, e.g.*, *NVIDIA Corp.*, 2022 WL 2812718, at *17 (affirming decision ordering inspection of a discrete category of informal board materials and officer-level communications that struck at the heart of the stockholder's concerns); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 789–94 (Del. Ch. 2016) (ordering production of CEO emails where CEO personally handled the personnel decisions that the stockholder sought to investigate).

[100] *See, e.g.*, *Brown v. Empire Resorts, Inc.*, C.A. No. 2019-0908-KSJM, at 56 (Del. Ch. Feb. 20, 2020) (TRANSCRIPT) (ordering, among other things, inspection as to documents related to the possibility of an information leak in a sales process, where such leak was alluded to but not detailed in the board minutes).

concerning search protocol for unearthing these documents. It seems likely that these documents are located in the emails of Carlson and one or two other key custodians from late May and/or early June.

Second, Plaintiff is entitled to Informal Board Materials and Officer-Level Materials concerning the delivery of the Revised Proposal to CCI. The Company shall confer with Plaintiff concerning search protocol for unearthing these documents. Again, it seems likely that these documents are located in the emails of Carlson and one or two other key custodians from late May and/or early June.

Third, Plaintiff is entitled to Informal Board Materials and Officer-Level Materials sufficient to show the events surrounding the updated projections. The Company shall confer with Plaintiff concerning search protocol for unearthing these documents. It seems likely these documents are located in the files, including potentially emails, of the management members responsible for preparing the updated projections along with the board members, if any, who instructed management to do so.

These three categories of documents provide Plaintiff with the information essential and sufficient to meet his stated purpose. Plaintiff's request for a broader scope of inspection is denied.

## III. CONCLUSION

For the foregoing reasons, Plaintiff is entitled to inspect limited additional categories of the Company's books and records. The parties shall confer as ordered in this decision and prepare a form of order memorializing this decision.